# Illinois Official Reports

## Appellate Court

***People v. Gordon*, 2016 IL App (1st) 134004**

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. SAMMY GORDON, Defendant-Appellant. |
| District & No. | First District, Second Division<br>Docket No. 1-13-4004 |
| Filed | June 21, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 09-CR-22250; the Hon. Neil J. Linehan, Judge, presiding. |
| Judgment | Affirmed; mittimus corrected. |
| Counsel on Appeal | Michael J. Pelletier and Kristen E. Mueller, both of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Carol L. Gaines, and Brian A. Levitsky, Assistant State's Attorneys, of counsel), for the People. |
| Panel | PRESIDING JUSTICE PIERCE delivered the judgment of the court, with opinion.<br>Justice Simon concurred in the judgment and opinion.<br>Justice Hyman concurred in part and dissented in part, with opinion. |

¶ 1    Following a jury trial, defendant Sammy Gordon was found guilty of armed robbery. He was sentenced to 37 years' imprisonment (22 years for armed robbery and a consecutive 15-year mandatory firearm sentence enhancement) and was awarded 1467 days of credit for time served in custody. On appeal, defendant contends he was denied effective assistance of counsel after defense counsel "promised" the jury in his opening statement that defendant would testify but failed to call him as a witness at trial. Defendant also contends his 37-year combined sentence is excessive and that he is entitled to an additional two days of credit for time spent in presentence custody. Defendant's conviction and sentence are affirmed; mittimus corrected.

¶ 2    Defendant and his two codefendants, Michael Gordon and Michael Bennett, were charged in three indictments with the armed robberies of three separate Family Dollar stores that took place in October and November 2009; defendant and codefendant Bennett were charged with a fourth armed robbery of a Family Dollar store in October 2009. The two codefendants pled guilty to all charges; defendant chose to stand trial. The State elected to proceed on an indictment charging him with the armed robbery of the Family Dollar store at 364 East 87th Street on November 13, 2009. The State nol-prossed all counts except one count of armed robbery while armed with a firearm.

¶ 3    Before jury selection began, the trial court asked defense counsel whether all witnesses who would testify for the defense were listed. Counsel replied that defendant would be the only witness "[i]f he chooses to testify." The court asked defendant, "You understand that's your decision whether you testify or not. I mean, obviously, you can talk to your lawyers about that; but, ultimately, that's your decision. Do you understand that?" Defendant replied, "Yes."

¶ 4    After the State delivered an opening statement to the jury, defense counsel's opening statement acknowledged the robbery at the dollar store by robbers who wore masks to hide their faces, that defendant was arrested nearby after the robbery, and that he signed a confession. Counsel also stated: "When the State rests you'll hear from Mr. Gordon. Mr. Gordon is going to testify in this case. Mr. Gordon is going to tell you where he was that night and what he was doing that night, and he will also tell you why he gave that confession." Counsel did not specify what that testimony would be.

¶ 5    Immediately after defense counsel completed his opening statement, the prosecutor asked for a sidebar where he objected that the defense opening statement indicated a possible alibi defense that was not disclosed to the State during pretrial discovery. Defense counsel told the court defendant was going to testify that at the time of his arrest, "he was walking down 87th Street. I asked him exactly where, and he said Indiana or Calumet. He didn't remember. It's like two blocks. That's two blocks west of the Dollar Store." Defendant would testify the arrest occurred "just after the robbery." The arresting officer would testify, however, that defendant was arrested in an alley. Agreeing with the prosecutor that defendant's intended testimony would constitute an alibi, the court told defendant's counsel: "We're going forward, but it would seem to me that you are trying now to insert an alibi defense which I consider improper and I consider sanctionable. In other words, not allowing him to testify to that. So whatever you need to do between now and the time you want to call your client, I suggest you do it." Defense counsel explained that defendant had told counsel only the previous Friday (the day of jury selection) that he planned to testify about where he was when arrested. "[T]hat was given

- 2 -

to me Friday when I went and spoke to him." The State complained that it was entitled to the alibi notice before Friday. Defense counsel responded, "I didn't know it before Friday."

¶ 6 Jerome Frazier, a former police officer, testified that on November 13, 2009, at about 7:30 p.m., he was in his home at 86th Street and King Drive, across the street from a Family Dollar Store, when his attention was drawn to a car "driving down the side alley kind of slow." The car, a Cadillac, was not displaying license plates. It drove across King Drive, past the Family Dollar parking lot and down the alley, then made a right turn and parked behind a garage. Frazier called the police because he thought the occupants of the car were going to break into the garage. Frazier entered his SUV, a GMC Yukon. As he pulled out of his driveway, he saw three men walking east through the alley, toward the Family Dollar parking lot. Frazier drove slowly past the three men. He saw them walking toward the Family Dollar store. Two of them hopped a wrought iron fence. The third man continued walking along the fence toward the store. Frazier noticed that the man had a surgical mask down around his neck. At trial, Frazier made an in-court identification of defendant as the man he had seen with the surgical mask. Frazier was 15 to 20 feet away from defendant when he first saw him.

¶ 7 Frazier drove around the block and went past the front of the store. He looked inside and saw defendant pointing and waving a handgun. Frazier again called the police on his cell phone and reported that the Family Dollar store was being robbed by gunmen. Frazier hailed a police car that was coming out of the alley and told the officers the store was being robbed at gunpoint. The officers pulled in front of the store, blocking the front door. Initially Frazier pulled behind the officers, but then he drove to the back of the store and tried to block its back door with his SUV. Then he walked to the wrought iron fence to get out of the way. He saw three men exit the back door of the store, hop over his SUV, and climb over the fence. He alerted the police. Later, after the police had arrested three suspects, he viewed a showup in the dollar store parking lot and identified defendant and the other two men as the robbers.

¶ 8 Four Family Dollar store employees were working in the store at the time of the robbery: Tiyanna Mays, Leequiter Smith, James Randle, and store manager Linda Johnson.[1] Two shoppers were also in the store during the robbery: Natasha Curry, who was accompanied by her two-year-old daughter, and Mattie Graves. At trial, during the testimony of Tiyanna, Leequiter, and very briefly during the testimony of James, the prosecutor played portions of the store security camera video that had recorded the armed robbery.[2] The witnesses described for the jury what was portrayed in the video, which contained no audio component.

¶ 9 Tiyanna Mays testified that she and Leequiter Smith were working as cashiers in the "bullpen," the cash register area where the money was kept. At around 7:30 that evening, as Tiyanna was ringing up a sale, a man came through the door, yelling. He was wearing a white surgical-type mask and was holding a gun with his arm extended fully outward. He was in his early twenties and wore a black jacket, a hat, black-and-white dirty shoes, and jeans. A second man came through the door; he also had a gun. A third robber wearing a bandanna on his face came into the store and locked the door.

¶ 10 Tiyanna made an in-court identification of defendant as the first person who entered the store wearing the surgical mask. The surveillance video was played, and Tiyanna identified defendant as the robber shown in the video pointing his gun at Tiyanna. She was frightened

---

[1]Johnson was not available to testify at trial.

[2]The record on appeal contains the DVD of the store's surveillance video and other trial exhibits.

- 3 -

because defendant was yelling and coming toward her with the gun. Tiyanna testified that, despite the mask and the bandannas worn by the robbers, their faces were partially visible; she could see their eyes, foreheads, and complexions. Defendant told Tiyanna to open the cash register, but she could not open it without ringing up a sale, so another employee swiped an item and opened the register.

¶ 11    The video was played again, and Tiyanna described store manager Linda Johnson coming to the cash area. Another robber, off-camera, had ordered that the safe be opened, and Linda was the only employee who knew the codes to open the safe. As the video continued to play intermittently, Tiyanna described herself sitting on the floor after being ordered to do so. The video showed Linda and one of the robbers attempting to open the safe. Another robber was getting everyone to come away from the windows where they might be seen and ordering them to sit in a line in the aisle. Defendant was seen making motions with his arms.

¶ 12    The video showed James Randle with his arms raised as he was told to come toward the front of the store. Then the video showed the employees and shoppers sitting on the floor waiting for the safe to open. Tiyanna explained that there was a delay getting the safe open; it was on a timer. After the manager entered a code, there was a 10-minute wait, and then the safe's timer triggered a beeping signal indicating a code had to be entered again for the safe to be opened. The video was played showing Linda going back to the safe to enter the second code. A robber was seen taking money from the safe while defendant stood over those sitting in the aisle, yelling at them. Defendant stayed mainly in front of the store during the robbery. After another robber took the money from the safe, defendant announced that the police were there. He and the other robbers ran to the back of the store. Later, Tiyanna looked at three men the police had in the parking lot. She recognized them as the robbers by their clothes and eyes, skin tone, and color. She identified defendant as one of the robbers. She recognized another man by his shoes, and she recognized the third man as the robber who took the money out of the cash register.

¶ 13    Leequiter Smith testified that when the robbers entered, one of them ordered Tiyanna to open the cash register but she was too nervous to do it. Leequiter told him she would do it; she scanned an item and hit the cash button, and the register opened. Then one of the robbers told them to get into the aisle because he did not want anyone to see them from the windows. It was on Leequiter's mind during the robbery that she wanted to go home to her son. One of the customers had her baby with her, and the child began to cry. Leequiter thought they needed to get the baby to be quiet. When Linda went to the safe to enter the code, Leequiter hoped the robbers would not harm Linda. After the safe was opened, one of the robbers saw a police officer at the door. The robber had his gun drawn and was pointing it at the people in the aisle. Leequiter testified that she was afraid the robber was going to shoot them, believing they had called the police. Then the robbers ran to the back of the store. After the robbers had been captured, Leequiter viewed a showup in the store parking lot, but she did not identify any of the suspects. Later, she went to the police station and viewed a lineup. She identified two of the men in the lineup, but at trial she could not remember whom she identified.

¶ 14    James Randle was working in the stock room when a man came through the door and held a gun about a foot away from James's face. The man wore a blue bandanna and asked him where the safe was, and James replied it was in the front of the store. The man put the gun to James's back and forced him to walk to the front of the store, where James saw other employees and customers and two other robbers. One of those two robbers had a bandanna

around his mouth; the other wore a white surgical mask. James was ordered to get down on the floor with everybody else.

¶ 15 Natasha Curry testified she was shopping in the store with her two-year-old daughter. One of the robbers tapped her and announced a robbery. He had a gun in his hand and wore a bandanna to conceal his face. She told him, "Just please don't hurt my daughter." Her child was screaming and hollering, and the robbers were telling her to shut the baby up. Natasha was scared. Natasha testified that after someone said the robbers had to wait 10 minutes before the safe would open, she heard one of the robbers say they were going to have to kill someone if they did not open the safe. After the robbers were arrested, Natasha viewed a showup in the parking lot and identified two of them, but at trial she did not remember whether she identified defendant. She did not view a lineup.

¶ 16 Mattie Graves, another customer, was shopping in the store when somebody grabbed her arm. She jerked away, and he grabbed her again. He wore a blue bandanna and held a gun. At trial, she demonstrated how the man pointed the gun at her chest area and said, "[T]his ain't no joke, lady. Lay down." As she lay on the floor in the aisle, one of the robbers asked her if she wanted to live. About 30 minutes after the robbery, the police brought some people for her to look at in the parking lot. She identified defendant as the robber who wore the surgical mask. She also identified one of the other robbers.

¶ 17 The employees and customers testified that they ran to the manager's office and locked themselves in when the robbers exited the store. They could see on the surveillance equipment monitor in the office that the police were outside, signaling that it was safe to come out. James Randle opened the store's locked door.

¶ 18 Officer Joey Buckley and his partner were the police officers whom Frazier flagged down. After speaking to Frazier, Buckley and his partner drove their squad car around to the front of the store and parked. Buckley went to the front door, looked in, and saw a male black subject whose face was covered by a bandanna; he was holding a pistol to a young lady's back, leading her around the store. Buckley saw another lady who was lying flat on the floor. He also saw two more individuals he believed were offenders; their faces were covered. Buckley radioed a "10-1" call for additional officers. When he tried the front door, it was locked. An offender wearing a bandanna made eye contact with Buckley and bolted to the back of the store. At that time other officers were arriving at the scene.

¶ 19 Officer Ranita Mitchell and her partner responded to a radio call about a robbery and drove to the rear alley of the Family Dollar store. Mitchell saw three young males jumping the fence in her direction and going north. Defendant was the third subject to jump the fence. He had a mask hanging off of his face and was holding a gun in his hand as he jumped the fence. Mitchell left her squad car and pursued all three men on foot. She was able to capture defendant in the rear yard at 8637 South Calumet Avenue. She never lost sight of him as she was chasing him. As he turned between two garages, she was right on his heels. When she apprehended defendant, he still had the gun in his hand, and the surgical mask was still hanging off of his face. She told him to drop his weapon and get on the ground. He complied and was placed in handcuffs. Mitchell identified defendant at trial as the individual she arrested who had the gun in his hand. She recovered the gun; her partner unloaded it. A Cadillac was parked in the alley next to the officers' squad car where they arrested defendant. As the officers drove defendant back to the Family Dollar parking lot, defendant blurted out, "I don't have the keys to the car. My boy does."

¶ 20    A second robber, Michael Bennett, was apprehended by officers about half a block north of the Family Dollar store. He was in possession of a blue bandanna. The third offender, Michael Gordon, was also captured near the store. A blue bandanna and a red knit cap were recovered from him.

¶ 21    Sergeant Schulz testified that shortly after the robbery, he entered the store and viewed the store's surveillance video. He observed what the offenders were wearing during the robbery. After the offenders were arrested, showups were conducted in the Family Dollar store parking lot. Schulz witnessed some of the showups and observed Tiyanna Mays identify defendant at that time. At the time, Schulz observed what each offender was wearing. Defendant was wearing clothing consistent with what the armed man in the video he viewed had been wearing.

¶ 22    After the showups, defendant was placed in Officer Mitchell's squad car, where Schulz advised defendant of his *Miranda* rights and asked defendant what happened. Defendant told Schulz, "You just don't know. It's hard out there, I am not a bad guy." Defendant also stated that he was in the store with Mike and a third man called Dog. When they ran out, there was a vehicle parked by the back door, and they jumped over it. Then they jumped over a fence. Defendant got caught in the alley. He had his gun on him when he got caught, and Mike also had a gun.

¶ 23    Schulz also spoke with the other offenders in custody, Michael Gordon and Michael Bennett. Schulz observed a handgun on top of a roof at 8641 South Calumet Avenue and a rubber glove lying between two houses, 8641 and 8637 South Calumet Avenue. An evidence technician collected the glove and the gun, a .45-caliber semi-automatic handgun with a magazine containing five rounds. It was racked back or cocked, ready to be fired.

¶ 24    When the jury recessed for lunch on the second day of trial, the court referred to defense counsel's opening statement, which had "laid out what appears to be a partial alibi or an alibi, is that correct?" Defense counsel responded, "Well, after speaking with Mr. Gordon, I don't believe what he will be testifying to is an alibi." The court asked, "What is he going to testify to?" Defense counsel responded, "I need to talk to Mr. Gordon to find out exactly what he is going to testify to." The court stated: "If it's an alibi you have to put it in writing by the end of today, and I need to know because I have to make a decision." Defense counsel replied: "I understand, [Y]our Honor. I had spoke [*sic*] to Mr. Gordon and he now seems to be changing his mind, so I have to talk to him one more time and find out." Noting that the State was asking for sanctions to bar defendant from testifying for failure to give an alibi notice, the court warned that defendant "may or may not be allowed to testify." The court instructed defense counsel: "You are going to have to make a proffer as to what your client is expected to testify to and I want that proffer in writing so I can make a ruling. *** I need to know today." The court addressed defendant personally.

"THE COURT: Do you understand that, Mr. Gordon, because this alibi or the testimony you are trying to proffer was not given to the State. The sanction they are asking for is I not allow you to testify to anything. Do you understand that?

MR. GORDON: I don't understand that.

MR. STOVALL: It means you won't be allowed to testify. Can it be any simpler than that because there was no notice given to the State.

Do you understand that?

MR. GORDON: I don't understand.

THE COURT: What don't you understand?

MR. GORDON: I don't understand because I wrote an affidavit, and I am not–

THE COURT: No, no. I am not going to get into–Do you understand the sanction is you won't be allowed to testify at all.

Do you understand that?

MR. GORDON: So how do I defend myself, Judge?

THE COURT: You can talk to your lawyer. I just want to make sure you understand what the law is.

Do you understand one of the sanctions is that you not be allowed to testify?

MR. GORDON: Yes, I understand.

THE COURT: Okay. That's all I want. I haven't ruled yet, but you need to talk to your lawyer. I need this proffer in writing by the end of the day."

¶ 25        During the lunch break, defense counsel filed an "Amended Answer to People's Motion for Pre-Trial Discovery," stating: "Defendant may present an alibi defense in the sense that he may testify that he did not participate in the armed robbery of the Family Dollar Store, that he was walking eastbound on 87th Street at the time he was arrested, that he was coming from the Burger King at 87th and Wabash, and that he was on his way to Kristen Laird's house, 8431 S. King Drive." After lunch, defense counsel advised the court: "Your Honor, I did submit the proffer you requested. However, if he does testify, that's what he would be testifying to, but according to Mr. Gordon now, he is not going to be testifying." A short time later defense counsel indicated that, after speaking further with his client, defendant "indicated that he would not testify. So I felt since you asked me to file [the amended answer to discovery motion], that I told him I am going to file that in case he changes his mind, and that's what he said he would testify to if he testified." The court addressed defendant:

"THE COURT: All right. Do you understand it's your choice as to whether or not you testify?

Do you understand that?

THE DEFENDANT: Yes, sir, I do.

THE COURT: All right. You have seen this affidavit and gone over this with your attorney, correct?

THE DEFENDANT: Yes, [Y]our Honor.

THE COURT: All right. So you are aware of the facts alleged in this affidavit?

THE DEFENDANT: Yes, sir.

THE COURT: All right. It's your decision to whether or not you are going to testify.

Do you understand that?

THE DEFENDANT: Yes, sir, I do.

THE COURT: But, obviously, you have to talk to your lawyer about it, right?

THE DEFENDANT: Yes.

THE COURT: At this time you are indicating you are not going to testify. Is that correct?

THE DEFENDANT: Yes, [Y]our Honor. I am not going to testify."

¶ 26    The trial resumed. A police evidence technician testified he processed the hood of Frazier's GMC Yukon for prints after being told that one of the offenders may have touched the hood when exiting the store.

¶ 27    Mathew Medina, a former assistant State's Attorney (ASA), testified that on November 14, 2009, he was assigned to felony review. He went to Area 2 and met with Detective Brian Casey. Then he spoke to defendant for about 30 or 40 minutes. Defendant agreed to give a handwritten statement, which Medina read aloud at trial.

¶ 28    Defendant stated he was 22 years old. On November 13, 2009, defendant's cousin Michael Gordon (Michael) and Michael Bennett (Bennett) approached defendant in Michael's car and asked defendant to get in the car so they could do a "lick," which is slang for a robbery. Defendant agreed because he needed money. Michael gave Bennett a silver .45-caliber handgun and gave defendant a black .32-caliber handgun. Defendant, wearing a surgical mask, entered the Family Dollar store and ordered everyone to get "down on the ground." He was followed by Bennett, wearing the blue and white bandanna, and then Michael. Bennett's job was to go around and make sure there was no one in the back of the store; Michael's job was to gather the money. There was a lady with a baby; Michael told defendant to deal with her. Defendant stated that he refused; he turned around and totally ignored her because it was not right to do anything to a lady with a baby. The manager went back to the safe to punch in the safe number. At that point defendant told Michael that the police were outside. Bennett was up front. Defendant and Michael ran out the back. Michael jumped the gate. Defendant followed and ran about two houses down. When he saw a lady police officer in front of him, he dropped the gun and fell on his face with his hands out. The police brought them to the store to be identified by customers. He was later taken to the police station. Defendant stated that he was very remorseful for what he did and that if he could change and go back in time he would not have been involved for the sake of his daughter and for the sake of the people in the store.

¶ 29    Defendant's signed statement was admitted in evidence, along with a photograph depicting defendant holding the completed, signed statement.

¶ 30    The State completed its case in chief with the testimony of a latent fingerprint examiner, who opined that a latent palm print lifted from Frazier's SUV matched defendant's palm print.

¶ 31    During a break after the State rested, one of defendant's attorneys advised the court that defendant was indicating "that he is not sure if he wants to testify or not. I don't know." Counsel requested and received a brief recess in which to speak with defendant in the lockup for five minutes. Subsequently, outside the presence of the jury, the defense presented a motion for directed finding, which the court denied. Then the court addressed defendant, asking what he wished to do. Defendant stated that he did not wish to testify.

¶ 32    The jury was brought back out, and the defense rested. Defense counsel's closing argument to the jury included the following: "As in any case, Mr. Gordon is presumed innocent. He does not have to prove a thing to you. Moreover, as in any case, the State has the burden of proving him guilty beyond a reasonable doubt and that burden is always on the State." The jury returned a verdict finding defendant guilty of armed robbery.

¶ 33    A presentence investigation (PSI) report was prepared and filed, and it included the following information. Defendant was born March 2, 1987, in prison where his mother was incarcerated. He was placed in DCFS custody in a foster home until he was three years old,

then was placed with a maternal cousin who turned him out when he was 15. He returned to DCFS. He lived in foster homes or group homes until age 22 when he returned to his cousin. Defendant really never had contact with his father; his mother died in 2007. He never married but had a 4-year-old daughter; he has had no contact with the child since his incarceration. Defendant was a high school graduate and attended Kennedy-King College for two years. He was employed by a McDonald's restaurant in Chicago for about three months in 2009 and was employed by MacAndrew's Construction, in Chicago, for about a year in 2008-09. He used alcohol and marijuana. Defendant had a prior misdemeanor conviction for theft of services for which he was sentenced on May 14, 2009, to one day in Cook County jail. His rap sheet showed that on November 5, 2009, he was arrested in Evanston and charged with criminal trespass to a vehicle and numerous Illinois Vehicle Code violations.

¶ 34    Detective Brian Casey testified for the State at the sentencing hearing. On November 13, 2009, Casey learned that defendant, Michael Gordon, and Michael Bennett had been arrested for an armed robbery at a Family Dollar store at 364 East 87th Street. Casey was part of a team of detectives assigned to investigate a string of armed robberies at other Family Dollar stores that had occurred in October and November 2009. One of the other armed robberies took place at a Family Dollar store at 8908 South Ashland Avenue on October 26; another occurred on November 3 at a Family Dollar store at 811 West 103rd Street. In each case surveillance video depicted three offenders wearing surgical masks. Casey interviewed defendant, who admitted involvement in both armed robberies. Casey also spoke with codefendant Michael Bennett, who, in a written statement, named defendant as being involved in the armed robberies.

¶ 35    The State presented argument in aggravation of sentence and asked "for a substantial amount of time" in prison. In mitigation, defendant's counsel argued that the trial evidence showed no one was injured in the armed robbery and that defendant had cooperated fully with arresting officers. Counsel stated that codefendant Bennett, who had two previous gun convictions, was sentenced to 25 years in prison, and codefendant Michael Gordon, who had four prior felony convictions, including a previous armed robbery, was sentenced to 21 years, Both codefendants had pled guilty. Defense counsel asked the court "not to punish Mr. Gordon for exercising his rights for a jury trial and to sentence Mr. Gordon the minimum sentence allowed by law." Defendant elected not to make a statement in allocution.

¶ 36    The court stated it had read and considered the contents of the PSI report and had also considered the facts of the case, matters in aggravation and mitigation, and arguments and statements of the parties. The court noted that one of the women in the store was a senior citizen, another a young mother whose small child was with her. The court observed that "from the way that Defendant and his Codefendants were reacting telling them to shut the child up, to get moving, and the way they were ordering the people around, there's potential for great harm to those individuals that were inside that store, particularly if this had escalated to a hostage situation." The court stated that "what took place on that day is incredibly aggravating" and that the testimony of those in the store about what they had experienced described "an extremely aggravating situation." The court considered that defendant "really has no prior criminal history." However, the court also considered Detective Casey's testimony of defendant's participation in two other Family Dollar store armed robberies and noted that "this was a pattern [of] behavior."

¶ 37    The court sentenced defendant to 22 years in prison for armed robbery and a consecutive mandatory 15-year term for being armed with a firearm, a total of 37 years. Credit was given for 1467 days presentence incarceration. A motion to reconsider sentence was filed and denied.

¶ 38    On appeal, defendant contends that he was denied effective assistance of counsel when his counsel promised the jury in opening statement that defendant would testify but then failed to call defendant as a trial witness.

¶ 39    The State responds that counsel's performance was not deficient where defendant simply changed his mind and chose not to testify when given the opportunity.

¶ 40    Claims of ineffective assistance of trial counsel are evaluated under the two-prong test established in *Strickland v. Washington*, 466 U.S. 668, 687, 694 (1984). Under that test, the defendant must show that (1) his attorney's performance was deficient, and (2) he suffered prejudice as a result. *Strickland v. Washington*, 466 U.S. 668, 687, 694 (1984); *People v. Getter*, 2015 IL App (1st) 121307, ¶ 72. To establish deficient performance under *Strickland*'s first prong, the defendant must show that his attorney's performance "fell below an objective standard of reasonableness," measured "under prevailing professional norms." *Strickland*, 466 U.S. at 688. Defendant must also overcome the presumption that his attorney's decisions were an exercise of reasonable trial strategy. *Id.* at 689. To establish prejudice under the second prong, defendant must show that there was a reasonable probability that, but for counsel's deficient performance, the result of the proceedings would have been different. *Id.* at 694. The failure to satisfy either prong of the *Strickland* test precludes a finding of ineffective assistance of counsel. *People v. Clendenin*, 238 Ill. 2d 302, 317-18 (2010).

¶ 41    Defendant has failed to demonstrate the first prong of *Strickland* where, as the State argues, the record demonstrates that after counsel's opening statement "promise" that defendant would testify, defendant simply changed his mind and chose not to testify.

¶ 42    A counsel's failure to provide testimony promised during opening statement can, in a proper case, constitute a serious error but is not ineffective assistance of counsel *per se*. *People v. Wilborn*, 2011 IL App (1st) 92802, ¶ 80; *People v. Manning*, 334 Ill. App. 3d 882, 892 (2002). In *People v. Briones*, 352 Ill. App. 3d 913 (2004), we stated: "We agree with *Manning* that if the defendant, contrary to defense counsel's previous assertion, decided not to testify at the trial, his counsel's performance was not deficient." *Id.* at 919. We also ruled that when defense counsel failed to call defendant to the witness stand as promised, it was her responsibility "to evidence in the record that she was not deficient, *i.e.*, that the determination was a result of the defendant's fickleness or of counsel's sound trial strategy due to unexpected events." *Id.* In *Briones*, because counsel failed to make such a showing in the record, we found that her performance was deficient. *Id.*

¶ 43    Here, the record demonstrates that as of the day the jury was selected, it was defendant's intent to testify, but that he later changed his mind. Before jury selection began, the court addressed defendant personally, asking whether he understood that it was his decision whether he testify. Defendant stated that he understood. The colloquies between the court and defense counsel, and between the court and defendant, suggest that defendant was keeping his own trial counsel in the dark as to whether he was going to testify and exactly what his testimony would be. On the last day of trial, defense counsel reported that defendant was "not sure if he wants to testify or not." It was not until after the State rested that defendant informed the court he did not wish to testify. We agree with the decisions in *Manning* and *Briones* that, where a

defendant decided after opening statement not to testify at his trial, his counsel's performance was not deficient. Thus, defendant has failed to satisfy the first prong of *Strickland*.

¶ 44 Defendant claims, however, that his failure to testify was not of his own volition, but that he "was backed into a corner" because his counsel failed to disclose the alibi defense before trial in response to the State's motion for discovery. He asserts his counsel's failure to disclose an alibi defense was "an inexplicable mistake" resulting in the trial court repeatedly threatening to bar defendant's alibi if he did testify. The record discloses that defense counsel did promptly file the alibi notice on the day following his opening statement, mitigating the possibility that the court would refuse to allow defendant to testify. On the same day he filed the notice, counsel also advised the court that defendant had changed his mind about testifying and had decided not to do so. The decision whether or not to testify was defendant's decision and his alone. See *People v. Medina*, 221 Ill. 2d 394, 403-04 (2006). Counsel stated that he filed the alibi proffer "in case [defendant] changes his mind, and that's what he said he would testify to if he testified." Because the trial court was never asked to rule on the issue, it is unclear whether counsel's filing of the alibi notice removed the possibility that the court would sanction defendant by barring his testimony. Any problem arising from defense counsel's opening statement was attributable to defendant's decision, and his alone, that he would not testify.

¶ 45 The record is also unclear as to when counsel actually knew of defendant's intent to testify that he was arrested on 87th Street. Defendant's affidavit, alleging he was arrested while he was walking on 87th Street by a male police officer, was filed in support of a pretrial motion to suppress statements some months before trial. A pretrial hearing was held, and the motion was denied. However, the record contains counsel's representation to the court after his opening statement at trial that he learned of defendant's intended testimony only the previous Friday. Defendant's ineffective assistance of counsel claim relies on a finding that trial counsel knew, at a date early enough to avoid sanctions, that defendant intended to present an alibi defense. Here there is nothing in the record to establish whether trial counsel's assertion to the trial court or defendant's assertion on appeal represents the correct determination regarding the timing of defendant's communication of his desire to testify. The record, therefore, does not rebut the presumption of competent representation by counsel. See *In re Alonzo O.*, 2015 IL App (4th) 150308, ¶¶ 20-21 (observing that when a claim seeking to overcome the presumption and satisfy the deficiency prong of *Strickland* is brought on direct appeal, the appellate court must proceed on a trial record "often incomplete or inadequate for this purpose"). Consequently, to the extent defendant's arguments rely on discussions with counsel held off the record, this issue is not proper for a direct appeal but is better suited for determination in a postconviction proceeding. See *People v. Winkfield*, 2015 IL App (1st) 130205, ¶ 28; *Manning*, 334 Ill. App. 3d at 893-94.

¶ 46 Defendant has also failed to establish that, under the second prong of *Strickland*, he was prejudiced by counsel's failure to fulfill his "promise" in opening statement that defendant would testify. Citing *Briones*, 352 Ill. App. 3d at 918, defendant claims that defense counsel's unfulfilled promise was of such magnitude that it negatively tainted both defendant and defense counsel in the eyes of the jury and left defendant without a defense. Defendant also cites *People v. Lewis*, 240 Ill. App. 3d 463 (1992) in support of his argument that counsel's failure to fulfill his promise that defendant would testify was highly prejudicial. However, neither these cases nor others cited by defendant held that breaking a promise of this type rises

to such an egregious level that prejudice can be assumed. Rather, satisfying the prejudice prong of *Strickland* requires a showing of actual prejudice and not simply speculation that the defendant may have been prejudiced. *People v. Brown*, 2015 IL App (1st) 122940, ¶ 47 (citing *People v. Bew*, 228 Ill. 2d 122, 135 (2008)). Defendant's claim fails because it is based on speculation. His only specific claim of prejudice is that his alibi testimony was crucial to challenging "a key piece of evidence against him," namely, Officer Mitchell's testimony that she arrested defendant in the alley, not on 87th Street.

¶ 47 Mitchell's testimony was but a small portion of the evidence of defendant's guilt where the State's presentation of evidence was overwhelming. Jerome Frazier identified defendant at trial and testified he suspected defendant and his two companions were about to commit a crime even before the armed robbery occurred. Moments after seeing defendant and his companions walk toward the Family Dollar store, Frazier looked through the store window and saw defendant inside with a gun in his hand as he and his colleagues robbed the store's occupants at gunpoint. The robbers were videotaped by the store's security camera. A DVD of the video introduced at trial showed that he was the first robber to enter the store, that he wore a surgical mask, and that he pointed his handgun almost directly at the camera. Viewing that portion of the video at trial, Tiyanna Mays identified defendant as the first robber to enter, despite the mask covering part of his face. As defendant left the store, he hopped over Frazier's SUV; the palm print lifted from the SUV matched defendant's palm print. A photograph taken at the police station following defendant's arrest showed him wearing the same clothing as depicted in the surveillance video. Officer Mitchell saw defendant and the other two robbers hopping a fence behind the store; she chased defendant, never lost sight of him, and arrested him just a couple of doors down from the store. When apprehended, defendant was still in possession of his surgical mask and handgun. Moments later, at a showup in the store's parking lot, Frazier and two of the robbery victims, Tiyanna Mays and Mattie Graves, identified defendant as one of the robbers. Defendant made an inculpatory statement to Sergeant Schulz. One day after the armed robbery, defendant confessed to committing the armed robbery in a detailed written statement. While defendant was dictating his confession, he was shown a still photograph from the store surveillance video, and he identified himself as the individual in the photo who was wearing the surgical mask and pointing the handgun. Given this overwhelming evidence of defendant's guilt, there was no reasonable probability that the outcome of his trial would have been different but for defense counsel's promise in the opening statement that defendant would testify.

¶ 48 We conclude that defendant has failed to establish ineffective assistance of counsel under either prong of *Strickland*.

¶ 49 Next, defendant contends that his 37-year sentence was an abuse of the trial court's discretion in light of his difficult upbringing, his education, and lack of a criminal history.

¶ 50 Generally, the trial court is in a better position than a court of review to determine an appropriate sentence based on the particular circumstances of each case. *People v. Kennedy*, 336 Ill. App. 3d 425, 433 (2002). The trial court has broad discretionary powers in imposing a sentence. *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). We accord the trial court great deference with respect to its role in balancing factors in aggravation and mitigation in order to craft a proper sentence. *People v. Burnette*, 325 Ill. App. 3d 792, 807-08 (2001) (citing *People v. Illgen*, 145 Ill. 2d 353, 379 (1991)). Therefore, a reviewing court may not modify a defendant's sentence absent an abuse of discretion. *Alexander*, 239 Ill. 2d at 212.

¶ 51    Defendant contends that the court abused its discretion in imposing what he deems an excessive prison sentence because the court failed to sufficiently consider, and act upon, what defendant characterizes as significant evidence of rehabilitative potential. He claims the court failed to consider adequately that he had a difficult upbringing, he had graduated from high school and completed two years of college, and he lacked a criminal history. However, each of these factors was known to the trial court from the PSI report. We presume, in the absence of evidence to the contrary, that the sentencing court considers mitigation evidence when it is presented. *People v. Burton*, 184 Ill. 2d 1, 34 (1998); *Jackson*, 2014 IL App (1st) 123258, ¶ 53. Here, that presumption was not overcome where the record contains no explicit evidence that mitigating factors were not considered by the court. See *People v. Flores*, 404 Ill. App. 3d 155, 158 (2010). The trial court is not required to detail precisely for the record the exact process by which it determined the penalty, nor is it required to articulate consideration of mitigating factors. *People v. Quintana*, 332 Ill. App. 3d 96, 109 (2002). After reviewing the record, we conclude defendant has not demonstrated that the sentencing court failed to give the proper weight to mitigating rehabilitative evidence in rendering sentence.

¶ 52    Moreover, the rehabilitative potential of a defendant is only one of the factors needed to be weighed in deciding a sentence. *People v. Evans*, 373 Ill. App. 3d 948, 968 (2007). The sentencing court is not required to give greater weight to a defendant's rehabilitative potential than it affords the seriousness of the offense. *Id.*; *People v. Coleman*, 166 Ill. 2d 247, 261 (1995). In fact, the seriousness of the offense is considered the most important factor in determining a sentence. *Evans*, 373 Ill. App. 3d at 968. Here, the trial court concluded that the seriousness of the offense was the critical factor in fashioning defendant's sentence: "[Defense counsel] has argued correctly that this Defendant really has no prior criminal history and that's something that I should consider and I am going to consider it and that will be part of the reason why I give the sentence I give. However, clearly this situation in this particular set of facts and what took place on that day is incredibly aggravating."

¶ 53    Defendant takes issue with the trial court's depiction of the crime as incredibly or extremely aggravating where no one was injured and only $1243 was taken from the store. However, the trial court stressed: "I really think that the facts of this case are one of [the] most important things that this Court has to look at when determining the sentence that Mr. Gordon should be given in the case and I think that the most critical piece of evidence actually is the videotapes ***." After viewing the video, the court observed that "from the way that the defendant and his codefendants were reacting telling them to shut the child up, to get moving, and the way they were ordering the people around, there's potential for great harm to those individuals that were inside that store."

¶ 54    The testimony of the store's employees and customers made a deep impression on the trial judge: "But when you are in court watching those witnesses testify, it brings more life to those videos and I think it's pretty clear from each and every one of those persons that testified in this matter as to what took place in that store. Each one of their individual's testimony that they had give [*sic*] as to what impact it had on them and what they saw and what they observed and what they told this Court, again, as to an extremely aggravating situation."

¶ 55    After viewing the videotapes and listening to the trial testimony of the witnesses who were present in the store during the robbery, the court was struck by the "terror and anxiety that [defendant] put these people through." Those witnesses were confronted by three masked men who burst into the store yelling and demanding that they get down on the floor. Two of the men

were armed. Defendant waved and pointed at them a .32-caliber blue steel semi-automatic firearm containing three live rounds. Bennett brandished a .45-caliber firearm loaded with five live rounds, which, when recovered, was found to be cocked and ready to fire. Natasha Curry testified that because the opening of the safe was delayed, one of the robbers yelled that they were "going to have to kill somebody" to force the employees to open it. While the employees and customers were not physically injured, their testimony and the video showed they were terrified and endured a frightening ordeal.

¶ 56    The sentence defendant received was within the permissible sentencing range. He was convicted of armed robbery while armed with a firearm, which has a sentencing range of 21 to 45 years. 720 ILCS 5/18-2(a)(2), (b) (West 2008). His 37-year sentence was well below the maximum permissible sentence. Where a sentence imposed is within the statutory range, it will not be deemed excessive unless it is greatly at variance with the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense. *People v. Fern*, 189 Ill. 2d 48, 54 (1999). We also note that during defendant's sentencing hearing, the State presented testimony from Detective Casey about two other armed robberies of Family Dollar stores committed by defendant and his two codefendants. Defendant admitted to Casey that he had participated in those armed robberies. In imposing sentence in the instant case, the trial court stated it would consider those two cases in aggravation. However, the court stated, "I have not seen those videos." Thus, unlike the impact defendant's conduct had on the witnesses in this case, the court did not know and did not consider the impact defendant or his codefendants' conduct had on the victims in those offenses. The sentence imposed reflected the court's assessment of the culpability of this defendant alone for this offense alone, as evidenced by the trial testimony and the video of this robbery.

¶ 57    Defendant relies on several cases where the trial court was held to have abused its discretion by imposing an excessive sentence despite the defendant's young age, unstable upbringing, or no prior convictions. However, we observe that in *Fern*, 189 Ill. 2d at 62, our supreme court rejected the use of comparative sentencing from unrelated cases as the basis for claiming that a specific sentence is excessive or that the sentencing court abused its discretion.

¶ 58    Defendant also contends that the sentences of his two codefendants illustrate the extent to which the trial judge failed to properly weigh his rehabilitative potential. Codefendants Michael Gordon and Michael Bennett were sentenced to 21 years and 25 years respectively. The dissent criticizes the trial court for not explaining the disparity of sentences and argues that due process requires that the trial court delineate the factors it considered in coming to the conclusion that defendant, who had no criminal history and allegedly strong rehabilitative potential, deserved a much harsher sentence than his codefendants. The explanation is that the codefendants pled guilty. Generally, an arbitrary and unreasonable disparity between the sentences of similarly situated codefendants is impermissible. *People v. Caballero*, 179 Ill. 2d 205, 216 (1997). However, a disparity in sentences, by itself, does not establish a violation of fundamental fairness. *Id.* "A sentence imposed on a codefendant who pleaded guilty as part of a plea agreement does not provide a valid basis of comparison to a sentence entered after a trial." *Id.* at 217. It is proper to grant dispositional concessions to defendants who plead guilty because the public interest in the effective administration of criminal justice is served. *Id.* at 218.

¶ 59    The dissent draws attention to defense counsel's reference at the sentencing hearing to the sentences of the codefendants and to their criminal histories. However, counsel's brief

statement of the codefendants' dispositions and backgrounds is inadequate to give us a sufficient basis to compare their sentences with that of defendant, especially where the claim is that defendant's rehabilitative potential was not appreciated. Our review of the record in this case, however, does contain Michael Gordon's sentencing proceedings. That codefendant's sentencing hearing clearly shows that the 21-year sentence he received was the result of the State's willingness to offer that sentence and the court's willingness to accept a plea to that offer. Nowhere in the guilty plea of that codefendant was there an indication of the threat of violence and the terror clearly demonstrated to the court in the instant case by the testimony of the witnesses and the videotape of the crime. The record before us does not contain the change-of-plea hearing for Michael Bennett; however, we do know that he also accepted the State's offer and the court accepted his agreement to accept that offer. Because the codefendants' sentences were products of plea agreements with the State, an enlightened comparison of the sentences of Michael Gordon and Michael Bennett with the sentence defendant received after he went to trial cannot be made. *Caballero*, 179 Ill. 2d at 217; *People v. Portis*, 147 Ill. App. 3d 917, 926 (1986).

¶ 60   Moreover, we fail to see how the sentences given to Michael Gordon and Michael Bennett support a claim that the sentencing court did not give sufficient consideration to defendant's alleged rehabilitative potential. First, contrary to the implication of the dissenting justice, defendant does not claim he was penalized for taking a jury trial. Any implication to the contrary must be rejected because defendant does not make this claim. Second, in pleading guilty, both codefendants acknowledged their guilt, showed their willingness to assume responsibility for their conduct, and made a public trial unnecessary. See *Caballero*, 179 Ill. 2d at 218. Third, by pleading guilty, the codefendants avoided the sentencing judge seeing, hearing, and fully appreciating the terror experienced by the witnesses in that store. The good fortune his codefendants may have had in avoiding the impact that hearing a witness or viewing a video had on the sentencing judge cannot redound to defendant's credit, especially where the different sentences are the basis of a claim that the court failed to adequately consider defendant's rehabilitation potential. It is proper to grant dispositional concessions to defendants who plead guilty because the public interest in the effective administration of criminal justice is served. *Id.* One reason appellate review affords the sentencing judge great deference is to reduce the temptation of a reviewing court to second-guess and to substitute its view of an appropriate sentence for that of the sentencing judge. We adhere to this principle and find defendant's claim of improperly disparate sentences is without merit.

¶ 61   We conclude that the court did not abuse its discretion in sentencing defendant to 37 years' for armed robbery. The experienced trial judge properly considered the seriousness of the offense and relevant factors in mitigation and aggravation when it imposed a sentence within the statutory range. The court acted within its discretion when it imposed a lengthy, yet well-thought-out sentence. Accordingly, we decline to reduce defendant's sentence or to remand for a new sentencing hearing.

¶ 62   Defendant also argues, and the State properly concedes, that he is entitled to two additional days of presentence incarceration credit. Defendant was arrested on November 13, 2009, and was sentenced on November 21, 2013. He was awarded 1467 days of credit for time served in custody. We agree with defendant's calculation that he spent 1469 days in custody prior to and excluding the sentencing date, and he must be awarded an additional two days of credit for presentence incarceration.

¶ 63    Pursuant to Illinois Supreme Court Rule 615(b)(1) and our authority to correct a mittimus without remand (*People v. Bowen*, 2015 IL App (1st) 132046, ¶ 68), we direct the clerk of the circuit court to correct the mittimus to reflect that defendant is to be credited with two additional days' credit for presentence incarceration for a total credit of 1469 days of presentence credit. We affirm the judgment of the circuit court in all other respects.

¶ 64    Affirmed; mittimus corrected.

¶ 65    JUSTICE HYMAN, concurring in part and dissenting in part.

¶ 66    I agree with the majority insofar as Gordon's conviction is concerned, but I would reverse the sentence and remand for a new sentencing hearing. Based on the facts of this case, Gordon's 37 years of imprisonment is grossly out of proportion to the sentences received by his codefendants. I would remand for reconsideration of Gordon's sentence with the complete sentencing documents of his codefendants available to the trial court and the parties.

¶ 67    Generally, a defendant, like Gordon, who proceeds to trial cannot compare his or her sentence to one imposed on a codefendant who enters a guilty plea. *People v. Caballero*, 179 Ill. 2d 205, 218 (1997). But, I believe the wide disparity between Gordon's sentence and those of his two codefendants establishes a factual basis that his sentence was substantively unreasonable and he should have received a sentence less severe than, or, at most, close to that given his codefendants who pled guilty. Unlike his codefendants, Gordon lacks an extensive criminal history. He also demonstrated an ability to overcome serious hardships, which suggests significant rehabilitative potential. Thus, I respectfully dissent from that part of the majority's decision finding that Gordon's 37-year sentence was not excessive.

¶ 68    As the majority points out, equal sentences are not required for all participants in the same crime. Nevertheless, our supreme court has condemned arbitrary and unreasonable disparity in sentences between and among codefendants who are similarly situated. *Caballero*, 179 Ill. 2d at 216; *People v. Godinez*, 91 Ill. 2d 47, 55 (1982) ("An arbitrary and unreasonable disparity between the sentences of codefendants who are similarly situated, of course, cannot be defended."). It is "not the disparity that counts, but the reason for the disparity." *People v. Rodriguez*, 402 Ill. App. 3d 932, 939 (2010). A difference may be justified by the relative character and history of the codefendants, the degree of culpability, rehabilitative potential, or a more serious criminal record. *People v. Eubanks*, 283 Ill. App. 3d 12, 25 (1996); *People v. Wolfe*, 156 Ill. App. 3d 1023, 1028 (1987).

¶ 69    While Gordon does not specifically raise this issue, his sentence creates the appearance that Gordon was punished for exercising his right to trial. Indeed, it is well settled that an accused may not be punished for exercising his or her right to a trial. *People v. Sivels*, 60 Ill. 2d 102, 104 (1975). I realize that a disparity between sentences imposed on a defendant who stands trial and his or her accomplice who pleads guilty does not of itself establish that the former was penalized for exercising the right to trial. *People v. Martin*, 47 Ill. 2d 331, 339 (1970). Rather, the assertion that the sentence was imposed because defendant demanded trial must be expressly established by the evidence. *Sivels*, 60 Ill. 2d at 104.

¶ 70    Dispositional concessions are properly granted to defendants who plead guilty when doing so serves the interests of the public in the effective administration of criminal justice. *Caballero*, 179 Ill. 2d at 218. A defendant who accepts responsibility for his or her wrongdoing and cooperates with the prosecution deserves leniency at sentencing. *Id.* While plea bargaining

and guilty pleas intimately affect the functioning of our criminal justice system, neither gives anyone the right to abridge nor abrogate a defendant's ability to freely exercise his or her right to trial.

¶ 71   Sammy Gordon and his codefendants, Michael Bennett and Michael Gordon, were charged with armed robbery and aggravated unlawful restraint. (Sammy Gordon and Michael Bennett were also charged with aggravated unlawful use of a weapon, and Bennett had an additional charge of unlawful use of a weapon by a felon.) All three were sentenced on the armed robbery charge alone. Sammy Gordon was sentenced to a total of 37 years in prison. His codefendants, Michael Bennett and Michael Gordon, received sentences of 25 years and 21 years, respectively, despite their more extensive criminal history. The record shows that Michael Gordon pled guilty and was sentenced to the minimum of 6 years for armed robbery and an additional 15 years for use of a firearm. At his sentencing, the State noted that he had two convictions for possession of a controlled substance and a conviction for armed robbery, for which he had been sentenced to six years in the Department of Corrections. Their codefendant Michael Bennett, who also pled guilty, had two prior gun convictions and received a 10-year sentence, with 15 years added on for use of a firearm. Conversely, after a trial, Gordon, who had no prior felonies or gun convictions and only a single misdemeanor conviction, received a 22-year sentence for the armed robbery charge, nearly four times that of Michael Gordon and more than twice that of Bennett.

¶ 72   In addition to the absence of a criminal history, the evidence presented suggests Gordon has strong rehabilitative potential. Gordon's upbringing was far from ideal. He was born in the Illinois Department of Corrections, where his mother was incarcerated, and immediately became a ward of the Department of Children and Family Services (DCFS), because his father was also incarcerated. He lived in foster homes until he was three years old, when he went to live with his mother's cousin. He returned to DCFS custody at 15, when their relationship became strained. Gordon then lived in various group and foster homes until he was 22 years old. Gordon has siblings and half siblings, who were also in DCFS custody, and he never had any relationship with his mother or father. Despite this difficult upbringing, Gordon graduated from high school, where he was a member of the football team for four years, and attended two years of college. Before his arrest, Gordon held several part-time jobs, winterizing homes for a construction company and working at McDonald's. He also volunteered as an assistant football coach at his former high school. Here is a young man whose mitigating factors, including age, rehabilitative potential, personal characteristics and character, and risk assessment convince me that his sentence is excessive and erroneous *vis-à-vis* his codefendants and should not stand.

¶ 73   Our constitution provides that penalties are to be determined according to the "seriousness of the offense" with the "objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11; in other words, not only does the sentencing court consider the rehabilitative factor, it must also act on it as an objective of the sentence. *People v. Gibbs*, 49 Ill. App. 3d 644, 648 (1977). Until his incarceration, Gordon had minimal involvement in the criminal justice system, and that, along with his ability to persevere despite difficult circumstances, suggests a strong possibility of rehabilitation.

¶ 74   Despite factors that generally weigh in favor of a lighter sentence, most glaringly his lack of a criminal record, Gordon, who opted to go to trial, received a much harsher sentence than his codefendants with extensive criminal records. As noted, Michael Gordon received 6 years

for the armed robbery charge while Sammy Gordon received 22 years, nearly four times more, for the same charge. In the absence of an explanation for the discrepancy, there is an appearance that Gordon may have been punished for opting to go to trial. At sentencing the trial court stated it would consider Gordon's lack of criminal history in mitigation, but nothing in the record disclosed what, if any, weight the trial court gave that factor or whether the court considered other factors indicating his rehabilitative potential. Although the majority notes that this information was contained in the presentence investigation report, to provide this court guidance in reviewing sentencing issues, I believe the best practice would be for the trial court to explain how those factors figured into its decision, particularly when codefendants' sentences vary greatly. Sentencing criminal defendants, one of the most challenging aspects of judging, involves an inexact process that often leads to second-guessing, especially where codefendants receive grossly disproportionate sentences. Only an examination of the facts of each case and the circumstances of each defendant can reveal the reasons that justify (or not) a conspicuous disparity. As the majority points out, Michael Bennett's change-of-plea hearing is not in the record before us. I would require that it be available on remand.

¶ 75        The absence of an explanation for the extreme disparity between Gordon's sentence and his codefendants' sentences also leads to a perception that the legal system is arbitrary and nontransparent, a perception that threatens respect for the law and for the courts as well as for the criminal justice system overall. Due process requires, at minimum, that the trial judge delineate the factors considered in coming to the conclusion that Gordon, who had no criminal history and strong rehabilitative potential, deserves a sentence many times more severe than his codefendants.

¶ 76        The majority places heavy emphasis on the trial court's statements about the nature of the crime, that, for example, it was "extremely aggravating" and the people in the store were filled with "terror and anxiety." This is no doubt true, but the trial judge does not state that Sammy Gordon's role in the crime as compared to his codefendants was any more aggravating and thereby warranted a sentence exceeding theirs by 12 and 16 years, respectively. A sentencing judge is not confined to the narrow issue of guilt but must determine the type and extent of punishment after the issue of guilt has been determined. Highly relevant, if not essential to that determination, is the consideration of the defendant's life and characteristics. *People v. Meeks*, 81 Ill. 2d 524, 535 (1980). I believe those factors, when viewed in light of the sentence Gordon's codefendants received, lead to the conclusion that a 37-year sentence was excessive.

¶ 77        I agree with the trial court that an armed robbery of a store with six people, including a young child inside, warrants serious punishment. Yet, Gordon, whose culpability appears from the record to be no greater than that of his codefendants, has a light criminal record compared to his codefendants and overcame an extremely difficult beginning and a troubled upbringing to graduate from high school and attend college, which suggest a good chance of rehabilitation.

¶ 78        There is a term for what occurred here—a jury tax or trial tax. Though it does not appear anywhere in the Criminal Code, the term refers to a defendant receiving a harsher penalty for going to trial and losing after either rejecting a plea bargain or, as with Gordon, proceeding to a trial when codefendants have pled out. While Gordon's counsel may not have used the term, my review of the record shows that Gordon was penalized for exercising his constitutional right to trial. His sentence is unjustifiably long in comparison to the sentences imposed on his codefendants who received a generous break for pleading guilty. The majority characterizes

the codefendants' plea as a "good fortune"; the vagaries of fortune, good or bad, should have no bearing on whether a sentence is an infirm aberration requiring reexamination.

¶ 79 The disparity in punishments is so glaring it must be subjected to reexamination. As our supreme court recognized in cases involving codefendants in the same crime, "fundamental fairness requires that similarly situated defendants not receive grossly disparate sentences." *People v. Fern*, 189 Ill. 2d 48, 58 (1999). I agree with Gordon's counsel, "Since the trial judge made clear at [Gordon's] sentencing hearing that [his] sentence was based on the judge's assessment of the facts of the case, and since the codefendants were convicted and sentenced on the same facts, the codefendants' sentences demonstrate that the trial judge failed to properly weigh [Gordon's] rehabilitative potential here."

¶ 80 I would reverse the sentence and remand.