NOTICE
Decision filed 01/30/20. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2020 IL App (5th) 170162-U

NO. 5-17-0162

IN THE

NOTICE
This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | St. Clair County. |
| | ) | |
| v. | ) | No. 16-CF-403 |
| | ) | |
| RANDI JOHNSON, | ) | Honorable |
| | ) | Robert B. Haida, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE WHARTON delivered the judgment of the court.
Justices Cates and Boie concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court did not abuse its discretion in sentencing the defendant where the defendant points to nothing in the record, other than the sentences themselves, to indicate that the court did not give adequate weight to the mitigating evidence, and where the record demonstrates that the court in fact did consider the mitigating evidence.

¶ 2    The defendant, Randi Johnson, appeals his 12-year sentences on two counts of aggravated battery with a firearm (720 ILCS 5/12-3.05(e)(1) (West 2014)) and his 8-year sentence on one count of aggravated discharge of a firearm (*id.* § 24-1.2(a)(2)). He argues that the trial court abused its discretion in imposing these sentences because the court failed to give adequate consideration to evidence in mitigation. We affirm.

1

¶ 3     The events at issue in this appeal took place on Easter morning in 2016 at the home the defendant shared with his girlfriend, Sade Mason, and their three young children. A few days earlier, the defendant and Mason had an argument. As a result, the defendant left the house and stayed with his grandmother. On Easter morning, he drove to the house to pick up his children to take them to church and a family Easter party. When he arrived, he encountered Roderick Harris, a man he did not know. The confrontation between the two men culminated with the defendant firing multiple gunshots at Harris, none of which struck him. Almost immediately after the confrontation ended, the defendant fired shots into a vehicle driven by Terry Cox. Both Cox and his pregnant girlfriend, Jada Hall, were struck and injured.

¶ 4     The defendant was charged with one count of attempt (aggravated battery) for firing shots at Harris, two counts of aggravated battery for shooting Terry Cox and Jada Hall, and one count of aggravated discharge of a firearm for firing multiple shots into Cox's vehicle. At trial, he argued that he acted in self-defense.

¶ 5     The defendant testified that he arrived at the house he shared with Mason at approximately 9 a.m. on Easter morning. He previously arranged to pick the children up to take them to church and then bring them to a family Easter party his grandmother was hosting later that day. When he arrived, the defendant saw a vehicle he did not recognize parked in the driveway. The driver pulled forward to give the defendant room to park. We note that another witness described the house as a duplex and explained that there was a shared driveway with room for multiple vehicles to park.

2

¶ 6    The defendant entered the house using his key. He testified that when he walked in, he saw a man he did not know standing next to Mason and his children. He thought the man was there to rob Mason. According to the defendant, the man pulled out a gun and struck the defendant with it. The gun fell to the floor, and the defendant was able to pick it up before the man could reach it. The defendant testified that the man then pulled out a second gun, so he shot at him. He testified that he fired three to five shots, none of which hit the man. The man turned around and started running. The defendant acknowledged that he "was still shooting" when the man turned and ran. However, he noted that he stopped shooting when the man ran across the street, explaining that he felt he was out of the "zone of danger" at that point. The defendant acknowledged that the man did not fire any shots at him.

¶ 7    The defendant further testified that at this point he could see that the man was calling the police. He felt that he needed to leave the scene and call the police himself to give them his version of events. The defendant got into his car and backed out of the driveway. He testified that another vehicle drove up and stopped in the road in a catty-corner position, blocking both lanes. The defendant saw the window starting to open, and he shot at the car. He stated that he started shooting because he was afraid that someone inside the other vehicle was going to shoot at his car. He explained, "I didn't know what it was. I didn't know who it was because I just got a gun pulled on me, so I started shooting." He testified that he fired four or five shots at the car. He acknowledged that no one inside the car actually fired any shots at him.

3

¶ 8    The defendant testified that he then drove away and called the police. He further testified that he drove to his grandmother's house, wiped down the gun, and put it on the side of her shed. We note that the police searched for the gun, but they were unable to locate it.

¶ 9    Roderick Harris testified that he and Mason were friends from high school. He went to visit her at her home the previous night, arriving sometime after midnight. Harris knew that the defendant was the father of three of Mason's children, but he had not previously met him. Harris was aware that the defendant was planning to pick up the children Easter morning.

¶ 10    Harris testified that when the defendant arrived at the house in the morning, he and Mason were upstairs talking. Mason went downstairs to talk to the defendant in the living room, while Harris waited upstairs. He testified that he could hear them arguing. He explained that the defendant grew angry when Mason told him to sit on the sofa and not to go upstairs or "through the house." The defendant, however, did go upstairs. Harris testified that he hid in the closet because Mason told him earlier that she did not "want no issues" between the defendant and Harris.

¶ 11    Harris testified that he had a BB gun with him that morning. He explained that he always carried the BB gun for protection, but he usually kept it hidden in the waistband of his pants. He noted that it was not functioning, but he explained that it looked enough like a real gun to scare anyone who threatened him. Harris took the BB gun out and held it in his hand while he was hiding in the closet. He explained that he did so because he could hear that the defendant was angry.

4

¶ 12    According to Harris, the defendant opened the closet door, saw him there, and said to Mason, "Is that what we doing now?" He did not indicate whether the defendant appeared to notice the BB gun. The defendant then left the house and drove away. Harris explained that he looked out the window and saw the defendant get into a white Chevy Impala and drive away. He then called his best friend, Terry Cox, to ask for a ride home.

¶ 13    Harris testified that the defendant subsequently returned to Mason's house. When the defendant entered the house the second time, Harris was in the living room with Mason and her children. According to Harris, the defendant was carrying a black handgun, although he was not pointing it at anyone. Harris testified that Mason grabbed hold of the defendant's arm and urged him not to shoot Harris. Harris exited the house and ran across the street. He testified that as he ran, the defendant fired three or four shots at him, none of which struck him.

¶ 14    Harris testified that Cox arrived while the defendant was shooting at him. He did not get into Cox's vehicle because he did not want to endanger Cox and his girlfriend, Jada Hall, who was also in the car. Harris testified that Cox drove away and then came back. According to Harris, he heard the defendant say that he was going to shoot the car. For this reason, Harris yelled to Cox, telling him to leave, but Cox apparently did not hear him. The defendant then backed his own car out of the driveway, pulled alongside the passenger side of Cox's car, and fired six or seven shots at the car.

¶ 15    Cox testified that Harris called him asking for a ride home. He drove to Mason's house with Hall and parked in the driveway. When they arrived, Cox called Harris's cell phone. Mason answered the phone and told Cox that Harris was using the restroom, so Cox

and Hall stayed in the car and waited for him. While they waited, someone drove up in a white Chevy Impala. Hall told Cox to move his vehicle to allow the Impala to pull into the driveway. When the defendant got out of the Impala and walked towards Mason's house, Cox could see the outline of a gun in his pocket.

¶ 16    Cox testified that approximately 30 seconds to a minute after the defendant entered the house, both he and Harris ran out of the house. Harris ran across the street, and the defendant ran to the end of his driveway. The defendant was shooting at Harris. Cox initially testified that Harris did not have his BB gun out. Later, however, he testified that he did not think Harris had the BB gun out, but he could not remember for certain.

¶ 17    Cox testified that he drove around the corner, made a U-turn, and drove back to pick up Harris. When he did so, the defendant pulled his vehicle next to the passenger side of Cox's vehicle and started shooting. Cox ducked. As such, he explained, he could not see where the defendant was aiming the shots; however, he heard five or six shots. He further testified that the windows of his car were shattered by the shots. Cox also described his injuries. He testified that a bullet grazed his back and fragments of glass from the broken windows got into his eye. He testified that he fully recovered from these injuries.

¶ 18    Hall's description of events was mainly consistent with that of Cox. She testified, however, that although she saw Harris come running out of the house and she heard four or five gunshots, she did not see the individual shooting the gun. She testified that the shots came from the area of the porch. She further testified that when the defendant shot at Cox's vehicle, she heard "several" shots, but she did not know how many. Hall described the position of Cox's vehicle as "catty-corner" in an intersection. She specifically testified that

6

there was enough room for another vehicle to pass. Finally, Hall testified that a bullet struck her in the leg and remained lodged there. She further testified that she did not suffer any complications related to her pregnancy as a result of the shooting, and her baby was not harmed.

¶ 19 Jennifer Washington, a neighbor of the defendant and Mason, also testified at trial. When the shootings took place, Washington was on her front porch smoking a cigarette. She saw both vehicles pull into the driveway. She recognized the Impala as the defendant's vehicle. She then saw the defendant get out of his vehicle and walk to the house. Washington testified that a few minutes after the defendant entered the house, the door opened and a man she did not recognize came out of the house. The man was walking backwards. As he did so, he pulled out a gun and pointed it at the house. However, Washington did not see him fire the gun. Instead, the man turned around and started running. Washington testified that the defendant came out and started shooting. She saw him fire "a couple of shots." Washington then ran inside her own house and told her children to get down on the floor. As a result, she did not see any more of the events outside. However, she testified that she heard seven to nine additional shots.

¶ 20 Crime scene investigator Virgil Perkins testified about the evidence he found in Cox's vehicle and at the scene of the shootings. Perkins recovered a total of 10 shell casings from the area in front of the house. In addition, he found a bullet fragment in the bed of a pickup truck that was parked nearby and another bullet fragment inside the house. Perkins found defects consistent with bullet holes in the pickup truck, the exterior of the defendant and Mason's house, and the interior of the house. When Perkins processed Cox's vehicle,

he noted that both front windows were shattered. He found six defects in the vehicle that were consistent with bullet holes. He also recovered Harris's BB gun from the vehicle.

¶ 21 The jury returned a verdict of not guilty on the charge involving the defendant's conduct towards Harris. However, it returned guilty verdicts on the three charges involving his conduct towards Cox and Hall. The defendant filed a posttrial motion, arguing, among other things, that these verdicts were inconsistent. The court denied the motion.

¶ 22 At the sentencing hearing, several witnesses testified on the defendant's behalf. Some of these witnesses testified that the defendant worked at a facility for mentally disabled adults, where he was an exemplary employee who often offered to take extra shifts. Other witnesses testified that he was a good father to his three children and that he was helping his sister to raise her child. In addition, the court considered the presentence investigation report (PSI). The PSI indicated that the defendant had only one prior criminal charge, a misdemeanor charge of disorderly conduct for which he received supervision.

¶ 23 The State requested that the defendant be sentenced to 18 years on each of the charges of aggravated battery and 10 years on the charge of aggravated discharge of a firearm. The prosecutor argued that two factors in aggravation were present—the need to deter others (730 ILCS 5/5-5-3.2(a)(7) (West 2016)) and the fact that the defendant's conduct threatened serious harm (*id*. § 5-5-3.2(a)(1)).

¶ 24 The defendant requested the minimum sentences on all three charges (six years on the charges of aggravated battery and four years on the charge of aggravated discharge of a firearm). He argued that five factors in mitigation were present. First, he argued that the defendant acted under strong provocation (*id*. § 5-5-3.1(a)(3)). In support of this argument,

he noted that the conduct underlying the three charges took place almost immediately after the defendant's confrontation with Roderick Harris. He emphasized that the jury found that the defendant acted in self-defense when he shot at Harris. The defendant further argued that the defendant did not have a significant criminal history (*id*. § 5-5-3.1(a)(7)); his conduct was the result of circumstances unlikely to recur (*id*. § 5-5-3.1(a)(8)); his imprisonment would cause hardship to his children and family (*id*. § 5-5-3.1(a)(11)); and the character and attitudes of the defendant indicated that he was unlikely to commit other crimes (*id*. § 5-5-3.1(a)(9)). The parties agreed that the sentences should be served concurrently.

¶ 25   Before pronouncing sentence, the court asked counsel how many bullets were recovered. They reminded the court that 10 shell casings were recovered from the scene along with 2 bullet fragments. The court then allowed the defendant to make a statement in allocution before going on to rule from the bench.

¶ 26   The court began by noting that the PSI reflected "one statutory factor in mitigation, that Mr. Johnson does not have a substantial history of criminality." The court next expressly found that the defendant's acts "were committed during a period of strong provocation." The court went on to consider the testimony of the witnesses. The court stated that it was "significant" that so many individuals were willing to testify on the defendant's behalf. However, the court also noted that it was not as certain as those witnesses that the defendant would never commit a similar offense in the future.

¶ 27   The court found one factor in aggravation. Specifically, it found that the defendant's conduct threatened serious harm. The court noted that the bullet that remained lodged in

9

Jada Hall's leg constituted serious harm even though her baby was not affected, and the injuries sustained by Terry Cox were minor. The court emphasized that the harm could have been far more serious. The court told the defendant that it found sentences longer than the statutory minimums to be appropriate because of "those moments when you squeezed off how many ever shots that you squeezed off at that vehicle." The court sentenced the defendant to concurrent sentences of 12 years on each count of aggravated battery and 8 years on the charge of aggravated discharge of a firearm.

¶ 28     The defendant filed a motion to reconsider his sentences. At a hearing on that motion, the court specifically stated that it found the witnesses who testified for the defendant at the sentencing hearing to be "compelling and significant." The court also recognized the "consequences of sending [the defendant] to the penitentiary." The court stated, "I minimized it as much as I felt I could under the circumstances. I did consider the mitigating factors. I found the mitigating evidence compelling."

¶ 29     In addition, the court addressed the defendant's argument that shorter sentences were warranted because he believed he was acting in self-defense when he shot into Cox's vehicle. The court acknowledged that the defendant saw both shootings as "all one transaction." The court explained, however, that the circumstances of the two shootings were different. The court further explained that, due to these differences, there was reason to find that the defendant was justified in shooting at Harris but there was "no significant legal reason to minimize [the defendant's] conduct" in shooting at Cox and Hall. The court therefore denied the motion. This appeal followed.

¶ 30    Trial courts enjoy broad discretion in determining the appropriate sentence to impose. *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). This is because the trial judge, who had the opportunity to observe the defendant, is in a better position than we are to weigh the relevant factors. *Id*. at 213. We will not set aside a defendant's sentence on appeal unless it constitutes an abuse of discretion. *People v. O'Neal*, 125 Ill. 2d 291, 300 (1988); *People v. Busse*, 2016 IL App (1st) 142941, ¶ 20. A sentence that is within the statutory range for the offense is presumptively appropriate. As such, we will not overturn a sentence within that range unless it is "greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense." *People v. Fern*, 189 Ill. 2d 48, 54 (1999). Although this standard is highly deferential, the court's discretion is not unlimited. *Busse*, 2016 IL App (1st) 142941, ¶ 27.

¶ 31    In determining an appropriate sentence, the trial court is required to consider all pertinent factors in mitigation and aggravation. *Id.* ¶ 22.  The court is not required to specify which factors it finds relevant or how much weight it assigns to each factor. *People v. Perkins*, 408 Ill. App. 3d 752, 763 (2011). Although the court must consider any mitigating factors that are present, it is not required to weigh such factors more heavily than it weighs aggravating factors, such as the seriousness of the crime. See *People v. Weiser*, 2013 IL App (5th) 120055, ¶ 32. Indeed, the seriousness of the crime is the most important factor for the court to consider. *Busse*, 2016 IL App (1st) 142941, ¶ 28.

¶ 32    Here, the defendant makes two arguments in support of his claim that the court did not give adequate weight to the mitigating evidence. First, he emphasizes that there was significant evidence of rehabilitative potential. Second, he argues that in finding the

defendant's conduct towards Cox and Hall to be a "separate case" from his conduct towards Harris, the court ignored evidence that the perceived threat from Harris was still ongoing, which in turn led the court to overlook factors in mitigation such as the extent to which he was acting under strong provocation and his conduct was the result of circumstances unlikely to recur. We find neither argument persuasive.

¶ 33    In support of his argument that the court failed to give adequate consideration to the evidence of his rehabilitative potential, the defendant highlights the evidence of his consistent work history and strong family ties. He also points out that he was a high school graduate with two years of college courses. We agree with the defendant that this evidence showed that he had rehabilitative potential. See, *e.g.*, *People v. Gordon*, 2016 IL App (1st) 134004, ¶ 72; *People v. Juarez*, 278 Ill. App. 3d 286, 295 (1996). However, we are not convinced that the court failed to consider this evidence or give it adequate weight. We presume that the court considered any mitigating evidence presented to it unless there is some indication to the contrary other than the sentence itself. *Busse*, 2016 IL App (1st) 142941, ¶¶ 22-23; *Perkins*, 408 Ill. App. 3d at 763. In this case, the defendant points to nothing to indicate that the court overlooked the evidence of his rehabilitative potential other than the sentences themselves. Moreover, the court explicitly stated that it found this evidence to be significant, both at the sentencing hearing and at the hearing on the motion to reconsider. Thus, it is clear from the record before us that the court considered this evidence and gave it a fair amount of weight.

¶ 34    As we explained earlier, however, the court was not required to give more weight to the defendant's rehabilitative potential than it gave to pertinent factors in aggravation.

See *Weiser*, 2013 IL App (5th) 120055, ¶ 32. The court placed a great deal of emphasis on the fact that the defendant's conduct caused serious harm to Jada Hall and that it could have caused far more serious harm than it did. In particular, the court focused on the number of shots the defendant fired into Terry Cox's vehicle. This is a legitimate concern.

¶ 35 In this regard, we find this case to be analogous to the supreme court's decision in *Alexander*. There, the defendant was a high school student who fired multiple shots at a fellow student after a confrontation. *Alexander*, 239 Ill. 2d at 208. The other student made threats to the defendant during that confrontation. *Id*. at 213-14. The defendant fired multiple shots at him in a crowded hallway while students and teachers were changing classes. *Id*. at 208. The trial court imposed a sentence near the upper end of the statutory sentence range, emphasizing that by firing five shots in a crowded hallway, the defendant acted "with total disregard for the potential harm to others." *Id*. at 213-14.

¶ 36 The appellate court found the defendant's sentence to be excessive due to the presence of mitigating evidence. It therefore reduced his sentence to the statutory minimum. *Id*. at 212. The supreme court reversed that decision, finding that the trial court did not abuse its discretion. *Id*. at 215. In reaching that conclusion, the court emphasized that by firing multiple shots in a crowded hallway, the defendant "endangered not only [the student who threatened him] but also innocent bystanders." *Id*. at 214. The supreme court explained that the trial court was not required to give more weight to the defendant's rehabilitative potential than it gave to the evidence that his conduct endangered multiple people. *Id*. The court therefore found no abuse of discretion and reinstated the original sentence. *Id*. at 215.

13

¶ 37    Here, too, the defendant fired multiple gunshots, thereby endangering innocent bystanders. The court had the discretion to place greater weight on this factor than it placed on the evidence of the defendant's rehabilitative potential.

¶ 38    The defendant also argues that by treating the defendant's act of shooting into Cox's vehicle as a "separate case" from his act of shooting at Harris, the court overlooked the evidence that the perceived threat from Harris was ongoing and ignored additional factors in mitigation. Specifically, he contends that the court ignored evidence that he acted under strong provocation (730 ILCS 5/5-5-3.1(a)(3) (West 2016)) and evidence that his conduct was the result of circumstances unlikely to recur (*id*. § 5-5-3.1(a)(8)). We disagree.

¶ 39    Contrary to the defendant's contentions, the court expressly found that the defendant was acting under strong provocation when he fired shots into Cox's vehicle. At the sentencing hearing, the court made this finding, but did not indicate how much weight it gave to this factor. At the hearing on the defendant's motion to reconsider his sentence, however, the court stated that there was "no significant legal reason to minimize [his] conduct," thus indicating that it did not give significant weight to this mitigating factor. We believe this was a reasonable decision. While the defendant testified that his adrenaline was high due to his confrontation with Harris, there was virtually no evidence that he had any reason to fear Cox and Hall. Although the defendant testified that Cox's vehicle blocked his path, both Cox and Hall testified that there was room to pass, and the defendant himself acknowledged that he was able to back up. Moreover, by the time the defendant shot into the vehicle, he had already stopped shooting at Harris because, by his own

14

admission, he no longer felt like he was in the "zone of danger" from Harris. The court did not abuse its discretion by giving little weight to this factor.

¶ 40    It is not clear from the record whether the court found that the defendant's conduct was the result of circumstances unlikely to recur at all, let alone how much weight it gave this factor if it did find it to be applicable. We note that the court was not required to find this factor to be applicable. Although the precise sequence of events that preceded the offense seems highly unlikely to recur, there was evidence that Sade Mason was concerned about trouble arising between the defendant and Harris. There was also evidence that the defendant and Mason had a relationship that was sometimes troubled. The defendant testified that he left the house after arguing with Mason because he knew that she would call the Department of Children and Family Services if he did not leave. At the sentencing hearing, the trial judge told the defendant that he wished he could be certain that the defendant would not commit a similar offense in the future. In any case, however, even assuming that the court did find that the offense resulted from circumstances unlikely to recur, the court was not required to give more weight to this factor than it gave the seriousness of the offense or the fact that the defendant's conduct threatened serious harm.

¶ 41    Finally, it is worth noting that none of the defendant's sentences are close to the upper end of the statutory sentencing ranges for the offenses. Aggravated battery with a firearm is a Class X offense. 720 ILCS 5/12-3.05(h) (West 2016). It therefore carries a sentencing range of 6 to 30 years. 730 ILCS 5/5-4.5-25(a) (West 2016). Aggravated discharge of a firearm is a Class 1 felony (720 ILCS 5/24-1.2(b) (West 2016)) with a sentencing range of 4 to 15 years (730 ILCS 5/5-4.5-30(a) (West 2016)). The defendant's

15

sentences are all closer to the lower ends of these ranges than to the upper ends. As such, we cannot agree with the defendant that these sentences are excessive. See *People v. Jackson*, 375 Ill. App. 3d 796, 802 (2007) (finding this to be a relevant consideration). We therefore find no abuse of discretion.

¶ 42    For the foregoing reasons, we affirm the defendant's sentences.


¶ 43    Affirmed.

16