2024 IL App (1st) 221555

FOURTH DIVISION
Order filed: August 1, 2024

No. 1-22-1555

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 17 CR 15971 |
| | ) | |
| WILLIAM JONES, | ) | Honorable |
| | ) | Angela M. Petrone, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE HOFFMAN delivered the judgment of the court, with opinion.
Presiding Justice Rochford and Justice Martin concurred in the judgment and opinion.

**OPINION**

¶ 1    Following a jury trial, the defendant, William Jones, appeals his convictions and sentences for two counts each of attempt first-degree murder of a peace officer and unlawful use of a weapon by a felon. We affirm his convictions, but due to the circuit court's consideration of improper factors in sentencing, we vacate the defendant's sentences and remand for a new sentencing hearing.

¶ 2    On October 5, 2017, an anonymous person called 911 and reported that a man in a black hoodie was holding a gun on the front porch of a residence, which also contained an unlicensed

daycare. When police responded to the home, the defendant, who was on the porch with two other men, went inside. Police obtained consent to enter from another resident of the home. They proceeded through the home with guns drawn. As police moved through the home, the defendant retreated to the basement, where he was living at the time. As the officers reached the basement, one officer went through the doorway and exchanged gunfire with the defendant. No one was hit, and the officers retreated. After a standoff, the defendant eventually surrendered and was arrested.

¶ 3    The defendant was indicted on thirty-seven charges and eventually tried before a jury on ten of those charges, which included two counts each of attempt first-degree murder of a peace officer, attempt first-degree murder, aggravated discharge of a firearm at a peace officer, aggravated discharge of a firearm, and unlawful use of a weapon by a felon (UUWF). The jury rejected the defendant's claim of self-defense and found him guilty on all charges. The following relevant testimony was presented at trial.

¶ 4    Chicago Police Department (CPD) Officer Zachary Gammonley testified that, on October 5, 2017, he and his partner, Officer Joe Biszewski, were on patrol in an unmarked Ford Explorer. They were both wearing plain clothes, on top of which they wore a vest identifying them as police. Shortly after noon, Gammonley and Biszewski were dispatched to 7609 South Lowe Avenue in Chicago for "a man with a gun wearing a black hoodie." Gammonley testified that upon arrival he observed three males on the porch who "fit the description that was given to us" by dispatch. He knew one of the males to be a man named Deandre Ollie (Deandre). He did not know the other individuals. According to Gammonley, as soon as he and Biszewski exited their vehicle, Deandre and one of the other men "stood up, looked in our direction, and ran right inside the house." The

third individual stayed on the porch and lifted up his shirt to show that he did not have a firearm. Gammonley patted him down, checked his name for warrants, and then released him.

¶ 5    Gammonley testified that he and Biszewski then knocked on the door, which was locked. A resident of the home, James Ollie (James), answered. Gammonley asked if James knew what was going on, and James said that he did not. He mentioned that he lived there and that his daughter ran a daycare on the first floor. Gammonley asked for consent to search the home for anyone who might have run into the house with a firearm, and James responded, "Sure, no problem." Gammonley described the building as having two floors, with a separate residence on each floor, as well as a basement.

¶ 6    Gammonley and his partner entered the building and began their search. As they searched the home, Gammonley and Biszewski had their firearms out, which Gammonley stated was "standard protocol if you're looking for a man with a gun." They first knocked on the door to the daycare, which was locked. They did not receive an answer. They then proceeded to the second floor, where James lived. Gammonley then proceeded towards the back kitchen area, where there is a stairwell going down to the first floor and the basement. Gammonley testified that he heard footsteps going down those back stairs. He signaled Biszewski that he heard someone, and they then proceeded down the stairs together. According to Gammonley, the stairwell was very dark because it was painted black and illuminated by a single light. He could only see by using the light attached to his firearm. When they reached the first floor, there was a door to the backyard. Gammonley unlocked the door and looked outside, but only saw other police officers who had since arrived at the scene. Biszewski let the other officers inside the house.

¶ 7    Gammonley, Biszewski, and Officer Irvinder Perez then continued down the stairs to the basement, with Gammonley in front and Biszewski and Perez behind. When they reached the bottom landing, Gammonley observed a single door which was partially open. The basement was similarly dark, with the only light coming from the officers' flashlights and the open door to the outside. Gammonley testified that he then announced "Chicago Police," pushed the door open, and took a few steps inside. Using the flashlight attached to his firearm, Gammonley surveyed the basement for anyone who may have been hiding. He stated that he then saw muzzle flashes from the back of the basement and heard gunshots ringing past his head. He returned fire and retreated out of the basement in search of cover. The firing lasted a matter of seconds. According to Gammonley, when he was being shot at, Biszewski was directly behind him in the same line of fire. Gammonley fired eighteen shots, emptying his magazine, which he dropped and left behind after he reloaded. All three officers then exited the building, where they set up a perimeter and waited for SWAT to arrive.

¶ 8    Gammonley testified that four or five minutes later, while he was outside speaking with other officers, the door to the daycare opened and Deandre and his sister came out with a number of children. Gammonley went up the front stairs, grabbed two of the children, and brought them across the street to take cover behind a car. The State then entered Gammonley's body camera video into evidence and played the video for the court. The video is consistent with his testimony.

¶ 9    Following the State's direct examination of Gammonley, defense counsel requested permission from the court to play additional footage from Gammonley's body camera in which Gammonley stated that Deandre had "beat two murder cases and that he's an asshole." The defense argued that, "if this officer believes that he's looking for a murderer, maybe he is trigger happy."

The court denied the defense's request, finding that Gammonley's opinions regarding Deandre were not relevant to the elements of the charged offenses or to the defendant's claim of self-defense. Instead, the court only allowed the defense to ask Gammonley whether he was looking for Deandre and whether he thought Deandre was dangerous.

¶ 10 On cross-examination, when asked whether he thought Deandre was dangerous, Gammonley responded, "I don't recall what my thoughts were about Deandre Ollie at the time." Gammonley agreed that it would not necessarily be illegal to possess a gun, and he acknowledged that, when he arrived at the scene, he did not see a gun and did not see anyone in distress. He also admitted that, when he and Biszewski were searching the house, they had not yet observed any evidence of anyone having committed a crime.

¶ 11 Officer Biszewski identified the defendant as one of the three men he saw on the porch when he and Gammonley first arrived at the home. Biszewski's account of events leading up to the shooting was consistent with Gammonley's. Biszewski added that he was behind Gammonley and "coming through the threshold" when he heard two loud gunshots and saw muzzle flashes from the back of the basement. Biszewski did not return fire because he did not have a clear shot and needed to move back to make room for Gammonley to retreat. The State entered Biszewski's body camera footage into evidence. Regarding Biszewski's positioning during the shooting, that video from a camera on his chest shows that Biszewski was initially positioned behind the wall to the right of the door to the basement. As Gammonley went through the doorway into the basement, Biszewski started to follow him. Just as Biszewski reached the right side of the doorframe, and before he reached the threshold, gunshots rang out, and Biszewski immediately moved back behind the wall to the right of the door. His left arm and possibly his left side appear to have been exposed

in the open doorframe for less than a second, while the gunshots can be heard. There do not appear to be any muzzle flashes visible in the video. On cross-examination, Biszewski also agreed that possessing a firearm is not a crime, and he acknowledged that, at the time that they started searching the home there was no evidence of a crime being committed.

¶ 12      Officer Brian Smith testified that he is a forensic investigator for CPD. In the afternoon of October 5, 2017, he collected gunshot residue ("GSR") test samples from the defendant's hands. Later forensic testimony revealed that both were positive for the presence of GSR. Part of the GSR test involves filling out a questionnaire. Smith testified that, in that questionnaire, the defendant stated, "I was minding my business when police entered my home without probable cause. The people entered my room and I defended, I defended my home, they did not identify themselves." Smith also photographed the defendant as he appeared immediately following the shooting. The defendant was wearing a gray T-shirt, blue sweatpants, white shoes, and a blue hat. He was not wearing a black hoodie.

¶ 13      By stipulation, audio recordings of a 911 call made by the defendant and a second call from a 911 operator to the defendant were admitted into evidence and played for the jury. In the first call, the defendant asked to speak to "whoever's in charge of the standoff on 76th and Lowe," before the call disconnects. In the second call, the 911 operator called the defendant back, and the defendant told the operator she had thirty seconds to get the commanding officer on the phone "or shots will be fired." The defendant began counting down from thirty and apparently disconnected the call at ten.

¶ 14      CPD Sergeant Richard Bednarek testified that he also responded to the call of a man with a gun at 7609 South Lowe Avenue and was the next to arrive at the scene after Gammonley and

Biszewski. After Gammonley and the defendant had exchanged gunfire, Bednarek called for SWAT assistance. He then went to the basement door, at which point he heard the defendant say, "If you come in, I'll shoot you. Don't come in, I'll shoot. I'm going to kill you." Bednarek tried to talk the defendant into surrendering, but he refused. The defendant then asked to speak with his child's mother, Melvina, and another officer placed the call and put the call on speaker. According to Bednarek, the woman had difficulty hearing and communicating with the defendant, but the defendant tried to tell her that he loved her and the kids and that he did not know whether he was going to make it home. With the defendant still refusing to surrender, Bednarek and the other officers exited the building and set up a perimeter outside while they waited for SWAT to arrive and take over.

¶ 15    Detective Hector Matias testified that he is a CPD hostage negotiator. He spoke with the defendant while the defendant was refusing to come out of the basement. At the beginning of their conversation, the defendant was "excitable, upset, kind of yelling," so Matias tried to calm him down. The defendant told Matias that he was afraid to come out because he thought that the police would shoot him. According to Matias, the defendant told him that "police came to his house and he started shooting at the police and ran into the basement." The defendant further told Matias that he was upset because the police "shouldn't be there" and were violating his rights by being in his home. The defendant said that he shot at the police because they were "violating his space" and he was "protecting his home." Matias initially convinced the defendant to throw out one magazine, before eventually convincing him to throw out both of his firearms. The defendant then came out peacefully and was arrested.

¶ 16    CPD Detective Timothy Murphy testified that he and Detective Tony Green interviewed the defendant at the police station after the defendant was arrested. Murphy read the defendant his *Miranda* rights, and the defendant agreed to give a statement. In the statement, the defendant told Murphy that he was sitting on the front porch when he saw an unmarked police car pull up. He then went into the house, up to the second floor, and then down the back staircase. After he got to the basement, the door opened, and he began firing his gun at "the officer that entered the rear basement door." The defendant fired all of the bullets from one gun, then picked up a second gun and fired all of the bullets from that gun. Murphy testified that the defendant said that "he knew that what he did was not right, it was wrong, but he said he wasn't doing anything wrong, so he said the officers had no right to come in -- into the house in the first place." The defendant told Murphy that he called 911 and told the operator that, if the police did not back away, he would continue shooting. The defendant stated that he did not know where the guns that he used came from. Murphy testified that, although the interview room had recording equipment, his interview with the defendant was not video or audio recorded because it was not legally required.

¶ 17    The parties stipulated that the defendant had previously been convicted of the felony offense of possession of a controlled substance. The State then rested its case, and the defendant made a motion for directed verdict, which the court denied.

¶ 18    The defendant then testified in his defense. He stated that he was twenty-six years old at the time of trial. In the fall of 2017, he was working as a dishwasher at Chipotle and living with his aunt in Chicago. He admitted that he was on probation for possession of cocaine. The defendant stated that he lost his job at Chipotle because he could not afford transportation and was either late or absent from work too often. After being fired from his job, he had to move out of his aunt's

house because he could not pay rent. Deandre's sister allowed him to sleep in the basement of her house at night. He had been living in that basement for two or three days prior to the incident in question.

¶ 19     The defendant stated that, shortly after noon on October 5, 2017, he was on the front porch with Deandre and another friend named Arthur, who was wearing a black hoodie. According to the defendant, no one had a gun. When he saw an unmarked police car pull up, he went inside the house because he was on probation and did not want to have any contact with the police. Deandre followed him inside. The defendant then went up to the second floor and walked to the kitchen at the back of the house to get a cup of water. He then sat on the enclosed back porch and drank his water. When he looked down to the ground, he saw a plain-clothes police officer wearing a police vest. The defendant finished his water and went inside to place the cup in the sink. He then "saw someone enter the front door with a gun leading the way into the house -- into the second floor apartment." The defendant stated, "once I saw the gun, I got startled, so I turned to go down the back stairs to the basement area." When he was on the first floor, he heard noises from the second floor and believed that "somebody was coming behind me following me into the basement." He believed it to be "the person that came in with the gun," presumably the officer whom he had seen out front. The defendant testified that he had not done anything wrong, so seeing the officer with the gun made him feel scared.

¶ 20     When he reached the basement, the defendant sat down in a chair near the front of the basement. He could hear footsteps coming from the stairs getting closer. He did not know why he was being followed. The defendant stated, "I knew that the police had guns and the way they was entering the house startled me so -- and I was scared at the time, so I went to the back of the

basement towards the furnace area." The defendant explained that, when he had moved in a few days earlier, he had discovered a box containing two guns. So, he grabbed those two guns and hid near the furnace. When asked why he hid from people he believed to be police officers, the defendant explained, "Because it felt like I was being hunted by them, like, they was just hunting me. They followed me from the porch to the second floor, then they followed me down to the basement, so I was scared."

¶ 21    The defendant testified that he then saw somebody enter the front of the basement, specifically "the police coming in with their gun out." He did not hear the officer announce himself, but he admitted that he knew that the person was a police officer. The officer had "two hands pointed in front of him as he was walking forward towards the back of the basement area scanning the basement." The flashlight on the officer's weapon was pointed at chest level. The defendant testified that he "couldn't even see" due to the bright light from the flashlight and the light coming in from the window behind the officer. The defendant stated that he then stepped backwards, bumped into some chairs and a table, and "Next thing I knew, gunshots was being fired." The defendant was not sure who fired first. He shot all of the bullets from both guns. The defendant stayed in the back of the basement until he was sure it was safe to come out. He then checked Gammonley's dropped magazine for additional bullets, but found that it was empty.

¶ 22    According to the defendant, he spoke with Sergeant Bednarek during the standoff, who said to him, "Where you at, man? Put it up or we'll shoot you, motherfucker." He asked Bednarek to call Melvina, the mother of his children, because "I felt like it was the end, like, the way that everything transpired I felt like the police was going to come in and kill me, and I was never going to see my family again." After speaking with Melvina, he called 911 because he felt threatened

and feared that he was going to be killed. The defendant then spoke with Detective Matias, who eventually persuaded him to throw out his weapons and surrender.

¶ 23    The defendant denied telling Detective Murphy that what he did was wrong. Rather, he recalled telling Murphy that he was glad that he was able to come out of the basement without being shot and killed. The defendant also clarified that, when he told Officer Smith that he was defending his home, he meant that he was protecting himself, not the property. The defendant also testified that, when he fired towards the police, he was not aiming at them and "just was shooting the guns." Following the defendant's testimony, the defense rested.

¶ 24    During closing arguments, the defendant argued that he had acted in self-defense and only fired because he thought that he would be shot, and the State made several comments that the defendant now contends were improper. First, the prosecutor told the jury that "a person doesn't have a lawful right to resist arrest," "even an unlawful act, you can't resist that." Second, the prosecutor stated that the defendant "turned that day care center into a shooting gallery," and that, "as soon as he heard there were children," Officer Gammonley "ran out and he treated them as if they were his own children. He ran to the front porch. He picked up one of the kids, and he picked up a second child in a basket to carry them, and he brought those children to cover, ladies and gentlemen."

¶ 25    The jury found the defendant guilty on all charges. The defendant moved for a new trial, asserting that the State failed to prove his guilt beyond a reasonable doubt and that the trial court erred in giving Illinois Pattern Jury Instruction (IPI) 24-25.12, regarding a peace officer's use of force in making an arrest, and a modified version of IPI 24-25.20, regarding a private person's use

of force in resisting an arrest. The court denied the defendant's motion, finding the evidence sufficient and the instructions to have been in accordance with the law.

¶ 26    At sentencing, the defendant argued that he had a minimal and non-violent criminal history, consisting of two drug-possession convictions. He presented supporting testimony from an aunt and a letter from a cousin, and, in a brief statement, the defendant apologized to the officers and to his family.

¶ 27    The court found that, in accordance with the one-act, one-crime doctrine, it would only sentence the defendant on the two counts of attempt first-degree murder of a peace officer and the two counts of unlawful use of a weapon by a felon. The court found "the actions of the defendant to be shocking in the callous disregard for the sanctity of human life, for the police officers who were responding to an assignment, to the lives of others in the house and to the lives of the children in the daycare." The court also contrasted the defendant's choices to those of Officer Gammonley, remarking, "I find it striking that we have two lives both raised here in Chicago that took very different paths," and "instead of running away from the scene after backing out of the basement doorway because he could not have known then the defendant had run out of ammunition having emptied two firearms, having ran back into the house and carried the children out of the daycare center so they would not be injured or killed." The defendant, on the other hand, was "screaming and yelling and making demands, 'if anyone comes in the basement I will shoot you, I will kill you.' " The court added that, although the defendant had claimed that the police had violated his space, "[t]he evidence shows that was not his home. He had been staying in that basement about four days because he had been kicked out of his home." The court further observed that "[a]ll the defendant had to do when the police approached was stop." Instead, he retrieved two guns and

"didn't hesitate to unload both of them." The court noted that the defendant then picked up Gammonley's dropped magazine, looking for more bullets, but did not find any. The court also acknowledged that "there's almost no criminal history to speak of."

¶ 28    The court found that the defendant had caused or threatened serious harm and that the sentence was necessary to deter others from committing the same crime. The court also found that "there was not a substantial [criminal] background at all and [the defendant] did lead a law-abiding life for a substantial period of time." While considering the defendant's character and attitude, the court remarked that "I would not even want to think about what would have happened if they had not investigated the call of a gun, saw a man with a gun, saw the daycare center and left and someone in that daycare center got hurt." The court continued, "[the defendant] saw it as an intrusion on a house that wasn't even his, where he'd only been camping out, if you will, for a few days. He had no right to do that. That's something about his character and attitude that really disturbs me." After considering these factors, the court sentenced the defendant to concurrent seventy-year sentences for the convictions of attempt first-degree murder of a peace officer and concurrent five-year sentences for the UUWF convictions.

¶ 29    The defendant filed a motion to reconsider his sentence, arguing that the court failed to adequately consider the statutory mitigating factors, including, in relevant part, whether the offense "was the result of circumstances unlikely to recur" and whether his "character and attitude indicates that he is unlikely to commit another crime." He also asserted that the court should have considered that he had acted under strong provocation. The court denied the motion, and this appeal follows.

¶ 30    The defendant raises nine issues on appeal, eight challenging his convictions and one contesting his sentences. The issue addressing his sentences is composed of six separate assertions of error. We see no merit to any of his arguments regarding his convictions. However, we agree with the defendant that the circuit court considered three improper factors during sentencing when it commented on Gammonley's traits, misstated the facts regarding the threat posed by the defendant prior to the shooting, and misstated the defendant's status as a resident of the home where the shooting occurred and his right to seek refuge in the home when police arrived.

¶ 31    In his first issue, the defendant contends that the State failed to prove that he did not act in self-defense when he exchanged gunfire with Officer Gammonley. Specifically, the defendant, who is a young black man, argues that it was objectively reasonable for him to fear that he would be unlawfully harmed by the white police officers when, despite having done nothing wrong and having avoided contact by retreating into his home, the police pursued him with their guns drawn and eventually cornered him in the basement. However, because the defendant's use of force was not necessary and his belief in the need to act in self-defense was not reasonable, we find this argument to be without merit.

¶ 32    "Self-defense is an affirmative defense, and once a defendant raises it, the State has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense, in addition to proving the elements of the charged offense." *People v. Lee*, 213 Ill. 2d 218, 224–25 (2004) (citing *People v. Jeffries*, 164 Ill. 2d 104, 127 (1995)). "The elements of self-defense are: (1) that unlawful force was threatened against a person; (2) that the person threatened was not the aggressor; (3) that the danger of harm was imminent; (4) that the use of force was necessary; (5) that the person threatened actually and subjectively believed a danger existed that required the use

of the force applied; and (6) the beliefs of the person threatened were objectively reasonable." *Id.* (citing 720 ILCS 5/7-1 (West 1998)). "If the State negates any one of these elements, the defendant's claim of self-defense must fail." *Id.* (citing *Jeffries*, 164 Ill. 2d at 127–28). Additionally, the use of deadly force is only justified if the defendant "reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony." 720 ILCS 5/7-1 (West 2016). "The relevant standard of review is whether, after considering the evidence in the light most favorable to the State, any rational trier of fact could have found, beyond a reasonable doubt, that defendant did not act in self-defense." *Id.* (citing *People v. Young*, 347 Ill. App. 3d 909, 920 (2004)).

¶ 33    When we view the evidence in a light most favorable to the State, we believe that a rational factfinder could conclude beyond a reasonable doubt that the defendant's use of force was not legally justified. The problem with the defendant's argument on this issue is that he focuses on the evidence *supporting* his defense. But the issue on appeal is not necessarily whether the evidence could have supported the defendant's claim of self-defense. Rather, we are tasked with looking for evidence *contradicting* his defense, and we must determine whether the jury could have rationally rejected his self-defense claim based on the evidence presented. In this case, it could.

¶ 34    Specifically, the jury could have rationally found that the defendant's use of force was not necessary and that his belief that such force was necessary was not reasonable. There was evidence showing that Gammonley and Biszewski were given consent to search the home for a man with a gun, that they announced their presence, that the defendant knew they were police officers, and that the defendant hid in a dark basement behind a furnace armed with two handguns and then began shooting at the officers, emptying both weapons in the officers' direction. From this

evidence, a jury could rationally conclude that the defendant's use of deadly force was not necessary or reasonable. Although the defendant argues that, as a young black man, he was fearful of the armed white officers following him through the home, in the absence of unlawful police conduct, that is not present here, shooting first at the police simply is not reasonable. Accordingly, viewing the evidence in a light most favorable to the State, the evidence supported the jury's rejection of the defendant's claim of self-defense.

¶ 35    In his second issue, the defendant asserts that the State failed to prove that he acted with the requisite mental state for attempt first-degree murder of a peace officer and that the jury instruction failed to properly instruct the jury regarding that mental state. Specifically, he contends that the mental state for attempt first-degree murder (and, correspondingly, attempt first-degree murder of a peace officer) is not simply "intent to kill," as the jury was instructed, but rather "intent to kill *without lawful justification*" and that the State's evidence failed to prove beyond a reasonable doubt that he did not intend to act in self-defense, i.e., *with lawful justification*, even if unreasonably. We reject both of the defendant's arguments.

¶ 36    The jury in this case was given IPI 6.05XX and instructed that, in relevant part, "A person commits the offense of attempt first degree murder of a peace officer when he, *without lawful justification and with the intent to kill an individual*, does any act which constitutes a substantial step toward the killing of an individual who was a peace officer." (Emphasis added.) The defendant, however, relying principally on the case of *People v. Guy*, 2023 IL App (3d) 210423, *appeal allowed*, 223 N.E.3d 637 (Ill. 2023), contends that "intent to kill an individual" is not an accurate statement of the mental state for attempt first-degree murder and that the "the mental state

and specific intent required to prove attempted first degree murder is 'intent to kill without lawful justification.' " *Id.* ¶ 27. We disagree and decline to follow *Guy*.

¶ 37 "Supreme Court Rule 451(a) requires that in a criminal case, if the court determines the jury should be instructed on a subject, and the Illinois Pattern Jury Instruction (IPI), Criminal, contains an applicable instruction, then the IPI instruction 'shall' be given unless the court determines it does not accurately state the law." *People v. Hopp*, 209 Ill. 2d 1, 7 (2004). "Illinois pattern instructions were 'painstakingly drafted with the use of simple, brief and unslanted language so as to clearly and concisely state the law.' " *People v. Pollock*, 202 Ill. 2d 189, 212 (2002) (quoting *People v. Haywood*, 82 Ill. 2d 540, 545 (1980)). Indeed, IPI 6.05XX accurately states the law regarding the mental state for attempt first-degree murder, which was established decades ago. Section 9-1(a)(1) of the Criminal Code (Code) (720 ILCS 5/9-1(a)(1) (West 2020)) provides that, in relevant part, a person commits first-degree murder when he kills an individual "without lawful justification" and, in doing so, "intends to kill." In line with the plain language of the statute, our supreme court long ago held that the mental state for attempt first-degree murder is "intent to kill." *People v. Harris*, 72 Ill. 2d 16, 27 (1978). Although the defendant cites *Guy* for the proposition that the holding in *Harris* has been implicitly altered over the course of several subsequent decisions to add a requirement that the defendant intended to kill without lawful justification (see *Guy*, 2023 IL App (3d) 210423, ¶¶ 29–59), we are not persuaded that the supreme court has overruled *Harris sub silentio*. To the contrary, the plain language of section 9-1(a)(1) refutes the defendant's argument. Under the first-degree murder statute, lawful justification is not part of the mental state. Rather, the statute's reference to justification solely relates to whether the action itself is justified. Accordingly, until the supreme court says otherwise, "intent to kill" is all

that the State must prove in order to convict a defendant of attempt first-degree murder. See Committee Note, IPI, Criminal, No. 6.05X ("The Illinois Supreme Court has unequivocally held that the specific intent to kill is an essential element of the offense of attempt first degree murder.").

¶ 38     Additionally, other cases have established that unreasonable or imperfect self-defense is a mitigating factor to murder, but not attempt murder. See *People v. Guyton*, 2014 IL App (1st) 110450, ¶ 46 (holding that an unreasonable belief in the need to act in self-defense did not invalidate a conviction for attempt first-degree murder). As this court explained in *Guyton*, imperfect self-defense is not a valid defense to attempt first-degree murder because the crime of attempt second-degree murder does not exist (see *People v. Lopez*, 166 Ill. 2d 441, 448–49 (1995)) and the jury does not have an opportunity to consider imperfect self-defense as a mitigating factor for attempt first-degree murder. There simply is no such available option. Despite having amended the attempt statute fifteen years after *Lopez* to allow defendants convicted of attempt murder to mitigate their sentence by proving at sentencing that they had been provoked (see *Guyton*, 2014 IL App (1st) 110450, ¶ 61), the legislature did not allow for consideration of imperfect self-defense as a mitigating factor to attempt first-degree murder.

> "The legislature could have easily addressed the issue of whether imperfect self-defense would be a mitigating factor in an attempted murder situation by adding such language when it made the above amendment, but chose not to. The legislature is presumed to know of judicial interpretation of statutes; thus, its inaction suggests agreement with the judicial interpretation of *Lopez* [citations] and further suggests a decision not to provide a mitigating factor of imperfect self-defense to attempted second degree murder." *Guyton*, 2014 IL App (1st) 110450, ¶ 45.

Ten years have passed since *Guyton*'s discussion of this issue, again without any amendment to the murder or attempt statutes allowing for mitigation of attempt first-degree murder based on imperfect self-defense. Thus, there remains a gap in the murder and attempt statutes for attempt imperfect self-defense, and it is the legislature's prerogative to address and fill that void. In the absence of such an option, an unreasonable belief in the need for self-defense does not negate the crime of attempt first-degree murder.

¶ 39    Furthermore, the defendant's proposed mental state would raise serious practical concerns regarding the difficulty of proving that a defendant did not unreasonably intend to act in self-defense. "Because a defendant's mental state is not commonly proved by direct evidence," it is normally "inferred from the surrounding circumstances, including the character of the defendant's acts and the nature of the victim's injuries." *People v. Jones*, 404 Ill. App. 3d 734, 744 (2010). In cases such as the present one in which a firearm is discharged at a specific individual, the State generally does not have a difficult time proving that the defendant acted with an intent to kill, since a firearm is a deadly weapon and shooting at someone strongly implies a desire to kill. But proving that the defendant did not discharge the weapon with an *unreasonable* intent to defend himself would be a much more difficult task. In many cases, it would require pure speculation, which is insufficient to sustain a conviction. See *People v. Woods*, 2020 IL App (1st) 173022, ¶ 13 (citing *People v. Smith*, 185 Ill. 2d 532, 546 (1999)) ("[N]o conviction can rest in whole or in part on speculation or guesswork."). In the present case, for example, the defendant's act of emptying two handguns at the door that the officers were coming through was sufficient to demonstrate an intent to kill, but disproving the defendant's assertion that he intended to act in self-defense, even though that belief may have been unreasonable, would be far more difficult if not impossible, and may

require pure speculation from the factfinder. This difficulty of proof might open the floodgates to defendants claiming self-defense even when a belief in the need for self-defense would be unreasonable, further militating against the defendant's position regarding the mental state for attempt first-degree murder.

¶ 40    In his third issue, the defendant contends that the evidence was insufficient to prove that he had the specific intent to kill Officer Biszewski. He argues that the evidence demonstrated that he was not aware that Biszewski was behind Gammonley and that he, therefore, could not have intended to kill Biszewski. However, there was sufficient evidence to support the conviction, and we will not upset the jury's determination on this issue.

¶ 41    "When considering a challenge to a criminal conviction based upon the sufficiency of the evidence, this court will not retry the defendant." *Smith*, 185 Ill. 2d at 541 (citing *People v. Wittenmyer*, 151 Ill. 2d 175, 191 (1992)). "Rather, in such cases the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (citing *People v. Young*, 128 Ill. 2d 1, 49 (1989), and *Jackson v. Virginia*, 443 U.S. 307 (1979)). "Thus, it is our duty in the case at bar to carefully examine the evidence while giving due consideration to the fact that the court and jury saw and heard the witnesses." *Id.* (citing *People v. Bartall*, 98 Ill. 2d 294, 306 (1983); *People v. Jefferson*, 24 Ill. 2d 398, 402 (1962); *People v. Bartley*, 25 Ill. 2d 175 (1962); *Young*, 128 Ill. 2d 1). "A conviction will be reversed only where the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt." *People v. Galarza*, 2023 IL 127678, ¶ 26 (quoting *People v. Belknap*, 2014 IL 117094, ¶ 67).

¶ 42    As we observed in our discussion of the defendant's previous issue, the defendant's intent is normally inferred from the surrounding circumstances. See *Jones*, 404 Ill. App. 3d at 744. And the defendant correctly observes that, when there is more than one alleged victim, "the evidence of specific intent must be viewed independently as to each attempt murder victim." *People v. Garrett*, 216 Ill. App. 3d 348, 353 (1991) (citing *People v. Velasco*, 184 Ill. App. 3d 618, 634 (1989)).

¶ 43    In support of his argument that the evidence did not prove his knowledge of Biszewski's presence at the basement doorway and, therefore, did not prove his intent to kill Biszewski, the defendant cites his testimony that he saw a single officer following him through the home, his testimony that he could not see past Gammonley's flashlight when Gammonley entered the basement and the two exchanged fire, and Biszewski's body camera video showing that Biszewski did not enter the basement at all. However, while it is true the body camera video did not show Biszewski following Gammonley all of the way into the basement, it does show that Biszewski's arm, and possibly his left side, crossed into the open doorframe and became exposed while the defendant was shooting in that direction. Consequently, when viewed in a light most favorable to the State, it is possible that the defendant could have seen Biszewski's arm and left side and, therefore, been aware of his presence. The visibility of part of Biszewski's body creates a conflict in the evidence regarding the defendant's intent to kill Biszewski that is appropriately resolved by the jury. See *People v. Gray*, 2017 IL 120958, ¶ 35 ("[I]t is the responsibility of the trier of fact to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from the facts."). We will not retry the defendant and substitute our judgment for that of the jury on this issue.

¶ 44    In his fourth issue, the defendant asserts that the trial court erred in instructing the jury on "Resisting Arrest" and "Peace Officer's Use of Force in Making an Arrest." The defendant argues that the resisting-arrest instruction misstated the law and that neither instruction was supported by the evidence presented. He further argues that the instructions had the effect of confusing the jury and negating his claim of self-defense. The defendant properly preserved these issues for review by objecting during the instruction conference and in his motion for new trial. See *People v. Young*, 2013 IL App (2d) 120167, ¶ 19. We agree with the defendant that the resisting-arrest instruction misstated the law and that the use-of-force instruction was not supported by the evidence, but we find both errors harmless.

¶ 45    We apply two different standards of review to the defendant's arguments in this issue. "The issue of whether the jury instructions accurately conveyed to the jury the applicable law is reviewed *de novo*." *People v. Parker*, 223 Ill. 2d 494, 501 (2006) (citing *People v. Herron*, 215 Ill. 2d 167, 174 (2005)). But whether an instruction is supported by the evidence and should have been given at all is reviewed for abuse of discretion. *People v. Mohr*, 228 Ill. 2d 53, 65 (2008).

¶ 46    The first instruction at issue addresses a modified IPI instruction on resisting arrest. The IPI instruction provides, in relevant part, that "A person is not authorized to use force to resist an arrest which he knows is being made by a peace officer, even if he believes that the arrest is unlawful and the arrest in fact is unlawful." IPI 24-25.20. The instruction given to the jury in this case modified the IPI instruction by stating that a person may not use force to resist "an *authorized act* or arrest ***, even if he believes that the *authorized act* or arrest is unlawful and the *authorized act* or arrest in fact is unlawful." (Emphasis added.) The defendant contends that the statement at

the end of the instruction that a person cannot resist an unlawful authorized act is contrary to the law. He is correct.

¶ 47 Although sections 7-7 and 31-1 of the Code together prohibit the use of force to resist an unlawful *arrest*, that prohibition "is not applicable when an officer is not undertaking an arrest." *People v. Shipp*, 2015 IL App (2d) 130587, ¶ 49. Rather, contrary to the instruction given to the jury in this case, individuals may use reasonable force to resist a police officer's unlawful conduct other than an arrest, including unlawful acts that would otherwise be authorized, such as an illegal search. See *City of Champaign v. Torres*, 214 Ill. 2d 234, 244 (2005) ("[W]here a police officer is not trying to make an arrest, section 31-1 would not prohibit a person from using reasonable force to prevent the officer from making an unconstitutional entry into his or her apartment."); *People v. Jones*, 2015 IL App (2d) 130387, ¶ 11 (explaining that an officer's unlawful entry into a person's home is not an authorized act and may be resisted). Accordingly, the resisting-arrest instruction given in this case misstated the law regarding the defendant's ability to use force to resist an unlawful authorized act.

¶ 48 The second instruction at issue is IPI 24-25.12, "Peace Officer's Use of Force in Making Arrest." The jury was given the unmodified IPI instruction, which states, in relevant part, that "A peace officer need not retreat or desist from efforts to make a lawful arrest because of resistance or threatened resistance to the arrest. He is justified in the use of any force which he reasonably believes to be necessary to effect the arrest or to defend himself and/or another from bodily harm while making the arrest." The defendant contends that this use-of-force instruction was improper because there was no evidence that the police were seeking to arrest him prior to the shooting or that he used force to resist an arrest. We again agree with the defendant.

¶ 49    "There must be some evidence in the record to justify an instruction, and it is within the trial court's discretion to determine which issues are raised by the evidence and whether an instruction should be given." *Mohr*, 228 Ill. 2d at 65. "Instructions which are not supported by either the evidence or the law should not be given." *Id.* (citing *People v. Simester*, 287 Ill. App. 3d 420, 431 (1997)).

¶ 50    There is no evidence  that Officers Gammonley and Biszewski were attempting to arrest the defendant prior to the shooting. Indeed, the officers themselves admitted that there was no evidence of illegal activity when they were conducting their search of the home, and the State in its brief likewise admits that the officers "were not arresting defendant" and were instead "investigating." Despite that admission, the State contends that the use-of-force instruction was "properly given to explain why these officers fired back." However, whether Gammonley was justified in returning fire at the defendant was not an issue in the case. His use of force was not relevant in any way to proving the defendant's guilt. Moreover, his use of force was not "while making an arrest," which is the situation addressed by the instruction. In the absence of any evidence that the officers were seeking to arrest the defendant at the time of the shooting, the instruction was not warranted, and the court abused its discretion in giving it to the jury. See *People v. Anderson*, 2012 IL App (1st) 103288, ¶ 33 ("[T]here must be evidence in the record to justify giving a particular instruction. (citing *People v. Hammonds,* 409 Ill. App. 3d 838 (2011)).

¶ 51    The defendant argues that these two instructions together deprived him of his right to a meaningful opportunity to present a complete defense because they undermined, obfuscated, and negated his self-defense theory. The defendant contends that these instructions improperly conveyed that there was no situation in which he could use force against a police officer, and he

maintains that the instructions confused the jury. However, the errors here were harmless beyond a reasonable doubt.

¶ 52    When a defendant has made a timely objection, as the defendant did here, the State bears the burden of proving "beyond a reasonable doubt that the jury verdict would have been the same absent the error." *People v. Thurow*, 203 Ill. 2d 352, 363 (2003). The State has met that burden here because, as we discussed in the defendant's first issue, the defendant's self-defense theory was without merit. Even if we accept his version of the facts, the defendant's use of deadly force against the officers in this case was not reasonable or necessary. For that reason, and because these instructions had no bearing on the determination of the validity of the defendant's self-defense claim, even if the instructions at issue had not been given, a rational trier of fact still would have rejected the defendant's claim of self-defense. Accordingly, we see no prejudice from the court's decision to give these instructions.

¶ 53    The defendant next argues that his trial counsel rendered ineffective assistance by failing to raise a defense-of-dwelling defense at trial. He contends that the evidence supported the defense and that the defense dovetailed with trial counsel's self-defense theory and argument. As with the defendant's claim of self-defense, we find that a defense-of-dwelling theory would have been meritless and that counsel, therefore, was not ineffective for not presenting the defense.

¶ 54    "We evaluate claims of ineffective assistance of counsel under the familiar standard set out in *Strickland v. Washington*, 466 U.S. 668 (1984)." *People v. Shepherd*, 2020 IL App (1st) 172706, ¶ 20. "To demonstrate ineffective assistance, a defendant must show that (i) his or her counsel's performance was deficient and (ii) any deficient performance prejudiced him or her." *Id.* (citing *People v. Utley*, 2019 IL App (1st) 152112, ¶ 36). "Where a defendant claims ineffective assistance

for failing to assert a defense, the record must contain enough evidence to support the theory." *Shepherd*, 2020 IL App (1st) 172706, ¶ 23. " '[A] defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor.' " (Alteration in original.) *People v. Grabow*, 2022 IL App (2d) 210151, ¶ 20 (quoting *People v. Everette*, 141 Ill. 2d 147, 156 (1990)). Nevertheless, "[i]t is well settled in Illinois that counsel's choice of jury instructions, and the decision to rely on one theory of defense to the exclusion of others, is a matter of trial strategy." *People v. Falco*, 2014 IL App (1st) 111797, ¶ 16 (citing *People v. Sims*, 374 Ill. App. 3d 231, 267 (2007)). " 'Such decisions enjoy a strong presumption that they reflect sound trial strategy, rather than incompetence,' and therefore, are 'generally immune from claims of ineffective assistance of counsel.' " *Id.* (quoting *People v. Enis,* 194 Ill. 2d 361, 378 (2000)). "However, the failure to request a particular jury instruction may be grounds for finding ineffective assistance of counsel if the instruction was so critical to the defense that its omission 'den[ied] the right of the accused to a fair trial.' " *Id.* (quoting *People v. Johnson,* 385 Ill. App. 3d 585, 599 (2008)).

¶ 55    "The defense of dwelling is a subset of self-defense in that it gives the defendant a legal justification to act under certain circumstances." *People v. Wiggen*, 2021 IL App (3d) 180486, ¶ 21. Specifically, section 7-2 of the Code provides that:

> "(a) A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to prevent or terminate such other's unlawful entry into or attack upon a dwelling. However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if:

(1) The entry is made or attempted in a violent, riotous, or tumultuous manner, and he reasonably believes that such force is necessary to prevent an assault upon, or offer of personal violence to, him or another then in the dwelling, or

(2) He reasonably believes that such force is necessary to prevent the commission of a felony in the dwelling."

"Defense of dwelling differs from self-defense in that, unlike self-defense, defense of a dwelling 'does not require danger to life or great bodily harm in order to invoke the right to kill.' " *People v. Sawyer*, 115 Ill. 2d 184, 193 (1986) (quoting *People v. Eatman*, 405 Ill. 491, 497 (1950)). "Nevertheless, as in cases of self-defense, the issue in defense of a dwelling is whether the facts and circumstances induced a reasonable belief that the threatened danger, whether real or apparent, existed." *Id.*

¶ 56     The defendant fails to establish that his proposed defense-of-dwelling defense would have changed the result of his trial, as he would not have been able to establish either of the requirements for the use of deadly force laid out in subsections (a)(1) and (a)(2). First, the evidence demonstrated that police did not enter the home in a "violent, riotous, or tumultuous manner." To the contrary, the officers had a civil discussion with James, during which James gave the officers consent to search the home. The officers then conducted their search of the home by calmly walking from room to room. When the officers reached the basement door, they proceeded in the same manner. Gammonley stated clearly, "Chicago Police," then non-aggressively pushed open the door, before cautiously walking through the doorway, at which point the defendant opened fire. There simply was no evidence that the officers' manner of entry justified the defendant's use of deadly force in defense of dwelling. See *Sawyer*, 115 Ill. 2d 184, 193 (1986) (holding that an alleged attacker had

not entered the home in a violent, riotous, or tumultuous manner when he "simply opened the screen door and stepped inside the house").

¶ 57    Second, it would not have been reasonable to believe that deadly force was necessary to prevent a felony inside the dwelling. As we discussed regarding the defendant's self-defense theory, the defendant's stated belief in the need to use deadly force to defend against the police officers was not reasonable. The mere presence of armed police officers in your home, when there is no appearance that those officers have done anything illegal or intend to unlawfully harm you, does not create a reasonable basis to shoot first at the officers in self-defense. This same lack of reasonableness that defeated the defendant's self-defense theory would have likewise defeated a defense-of-dwelling defense.

¶ 58    Additionally, "[i]n order to justify the use of force in defense of dwelling, the entry into the dwelling must be unlawful or there must be an attack upon a dwelling." *People v. Ellis*, 107 Ill. App. 3d 603, 613 (1982) (citing *People v. Chapman*, 49 Ill. App. 3d 553, 556 (1977)). And in this case the officers' entry into the dwelling was lawful because they were given consent by a resident of the home, and the officers in no way made an "attack" on the dwelling.

¶ 59    Accordingly, because he has not shown that the defense had merit and that he was denied a fair trial by counsel's failure to present it to the jury, the defendant has failed to demonstrate that trial counsel acted deficiently or that he was prejudiced by counsel's failure to present a defense-of-dwelling theory. Therefore, the defendant has failed to demonstrate ineffective assistance of counsel.

¶ 60    In his sixth issue, the defendant asserts that the trial court erred in excluding body camera footage revealing that Officer Gammonley believed that Deandre had murdered two people. The

defendant argues this evidence was relevant because Gammonley might have believed that he was pursuing Deandre and that "Gammonley's belief that he was confronting a possible double-murderer had at least a 'tendency' to make it 'more probable' that he fired first in the basement to protect himself," thereby supporting the defendant's theory "that he reasonably believed he had to fire at Gammonley to protect himself from being shot or killed." Although we agree with the defendant that this evidence was somewhat relevant, albeit to a very limited extent, we do not believe that the court abused its discretion in excluding the video due to its minimal and speculative probative value.

¶ 61    Initially, the parties dispute the applicable standard of review. The defendant contends that this issue should be reviewed *de novo* as a denial of his constitutional right to a meaningful opportunity to present a complete defense. See *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006); see also *People v. Manion*, 67 Ill. 2d 564, 577 (1977) (explaining that a defendant's constitutional rights are violated when "a crucial part of the defendant's case [is] excluded, so that the accused had an insufficient opportunity to respond to the State's accusations"). The State counters that the standard of review should be abuse of discretion, as is typically the case for questions concerning the admissibility of evidence. See *People v. Robinson*, 217 Ill. 2d 43, 62 (2005) ("A reviewing court will not disturb the trial court's decision regarding the admission of evidence at trial absent a clear abuse of discretion."). We agree with the State.

¶ 62    The constitutional violations at issue in the federal cases that the defendant cites do not relate to the type of ordinary, case-specific relevance rulings at issue in this case. Rather, they focus on the constitutionality of state rules of evidence "that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote." *Holmes*, 547 U.S. at 520; see,

*e.g.*, *Crane v. Kentucky*, 476 U.S. 683, 687 (1986) (holding that a Kentucky procedure barring the relitigation at trial of a pretrial ruling regarding the voluntariness of a confession denied the defendant a meaningful opportunity to present his defense). Indeed, as the United States Supreme Court stated in *Nevada v. Jackson*, 569 U.S. 505, 509 (2013), "[o]nly rarely have we held that the right to present a complete defense was violated by the exclusion of defense evidence under a state rule of evidence." This is not that rare type of case. To the contrary, the issue here is simply the application of a well-established rule of evidence. Accordingly, as is customary for rulings on the relevance of evidence, the standard of review is abuse of discretion. See *People v. Johnson*, 2018 IL App (1st) 140725, ¶ 58 (rejecting defendant's argument that the trial court's exclusion of evidence deprived her of her right to present her defense and should be reviewed *de novo*, explaining that the "defendant's argument is really a challenge to the trial court's exclusion of the proposed evidence, [and] we will review that decision for an abuse of discretion").

¶ 63    Turning to the merits of the issue, in the video that the defendant sought to admit into evidence, Officer Gammonley tells another officer outside the home that Deandre was "an asshole" who had "beat two murder charges." Defense counsel wanted to ask Gammonley about these statements and use the video for impeachment, if necessary. In arguing the relevance of the evidence, defense counsel stated, "if this officer believes that he's looking for a murderer, maybe he is trigger happy." Counsel then seemed to suggest that Gammonley's statements about Deandre increased the likelihood that it was Gammonley, and not the defendant, who shot first. The trial court disagreed with the defense and excluded the use of the video, reasoning that Gammonley's thoughts "are irrelevant to [whether] *** the defendant thought that he was acting in a justifiable manner or not."

¶ 64    While the trial court may have misconstrued the relevance of the evidence as being related to the defendant's thoughts, rather than Gammonley's, its ultimate decision to exclude the evidence on relevance grounds was not an abuse of discretion. "The controlling principles concerning the admissibility of evidence are well settled. The court must ask whether the [proffered] evidence fairly tends to prove or disprove the offense charged and whether that evidence is relevant in that it tends to make the question of guilt more or less probable." *People v. Wheeler*, 226 Ill. 2d 92, 132 (2007) (citing *People v. Caffey,* 205 Ill. 2d 52, 114–15 (2001)). "It is entirely within the discretion of the trial court to 'reject offered evidence on grounds of irrelevancy if it has little probative value due to its remoteness, uncertainty, or possibly unfair prejudicial nature.' " *Id.* (quoting *People v. Harvey,* 211 Ill. 2d 368, 392 (2004)). While it is true that "each party is entitled to present evidence which is relevant to its theory of the case" (*id.* (citing *People v. Molsby*, 66 Ill. App. 3d 647 (1978)), "it is also true that defining the precise limits controlling the admission of such evidence is difficult and if the evidence is *** too speculative to shed light on the fact to be found, it should be excluded" (*id.* (citing *People v. Dukett*, 56 Ill. 2d 432, 450 (1974)).

¶ 65    Applying these principles, we cannot conclude that the court abused its discretion.  The evidence of Gammonley's statements concerning Deandre was of minimum probative value. Further, in the absence of any evidence that Gammonley fired first, his statements would only have encouraged speculation on the issue.  The defendant's argument requires two tenuous inferences. First, it must be assumed that Gammonleys's belief that Deandre had committed two murders made him "trigger happy."   And second, from his statement, one would have to infer that Gammonley fired first out of fear.  Both propositions are purely speculative and unsupported by any evidence in the record.

¶ 66    Moreover, even if we were to conclude that the evidence should not have been excluded, the evidence's minimal probative value would preclude any resulting prejudice to the defendant. In order to warrant reversal, an erroneous decision regarding the exclusion of evidence must result in "manifest prejudice to the defendant." *People v. Barnes*, 2013 IL App (1st) 112873, ¶ 41 (citing *People v. Lucas,* 151 Ill. 2d 461, 489 (1992)). Given the questionable inferences that the jury would have had to draw from the defendant's evidence, combined with the fact that the defendant himself did not testify that Gammonley shot first and there was no other evidence suggesting that he did, we can hardly say that the admission of the video containing Gammonley's thoughts about Deandre would have affected the outcome of the trial, and its exclusion did not rise to the level of manifest prejudice.

¶ 67    In his seventh issue, the defendant asserts that the State committed prosecutorial misconduct during closing argument. Specifically, the defendant alleges that the State "praised and emphasized" Gammonley's rescue of the children in the daycare after the shooting, "baselessly insinuated that [the defendant] might have harmed the children in the house had the police not entered, inaccurately suggested that the police were enforcing a 'day care' firearm prohibition, and made false, inflammatory arguments that [the defendant] turned the unlicensed 'day care' in the house 'into a shooting gallery.' " Although the defendant concedes that this issue is not preserved, he argues that prosecutor's comments rise to the level of plain error and that, alternatively, trial counsel rendered ineffective assistance by not objecting to the comments. We see no merit to either of the defendant's arguments.

¶ 68    " '[T]he plain-error doctrine bypasses normal forfeiture principles and allows a reviewing court to consider unpreserved error when either (1) the evidence is close, regardless of the

seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence.' " *People v. Glasper*, 234 Ill. 2d 173, 203 (2009) (quoting *People v. Herron*, 215 Ill. 2d 167, 186–87 (2005)). Regarding the first prong, we do not view the evidence in this case to have been close. As we have recounted, the defendant admitted to shooting at the officers and claimed that his actions were justified. However, his use of deadly force against the officers was not reasonable or necessary. Those issues were not close, as there was no evidence that the police fired first or did anything unlawful to justify the defendant's use of deadly force against them. In other words, the prosecutor's comments, standing alone, did not "severely threaten[] to tip the scales of justice against [the defendant]" (*Herron*, 215 Ill. 2d at 187) and did not result in manifest prejudice.

¶ 69    As for the seriousness of the error, we likewise do not believe that the prosecutor's comments, even if improper, were so serious as to rise to the level of plain error. "Error under the second prong of plain error analysis has been equated with structural error, meaning that automatic reversal is only required where an error is deemed to be a systemic error that serves to 'erode the integrity of the judicial process and undermine the fairness of the defendant's trial.' " *People v. Cosmano*, 2011 IL App (1st) 101196, ¶ 78 (quoting *Glasper*, 234 Ill. 2d at 197–98). "In other words, '[a]n error is typically designated as structural only if it necessarily renders a criminal trial fundamentally unfair or an unreliable means of determining guilt or innocence.' " *Id.* (quoting *People v. Thompson,* 238 Ill. 2d 598, 609 (2010)). "Structural errors have been recognized in only a limited class of cases including: a complete denial of counsel; trial before a biased judge; racial discrimination in the selection of a grand jury; denial of self-representation at trial; denial of a public trial; and a defective reasonable doubt instruction." *Id.* (citing *Thompson,* 238 Ill. 2d at 609).

"Error in closing argument does not fall into the type of error recognized as structural." *Id.* Accordingly, the defendant has not demonstrated second-prong plain error.

¶ 70    We also do not believe that the defendant has established his alternative argument of ineffective assistance of counsel. For the same reasons that the defendant failed to establish first-prong plain error, the defendant cannot show prejudice from counsel's failure to object to the allegedly improper comments. In the context of the evidence in the case, the comments were not of such a prejudicial nature as to allow for a reasonable probability that the result of the proceeding would have been different if counsel had objected to the comments. See *People v. Cherry*, 2016 IL 118728, ¶ 24 (noting that, to show prejudice, a defendant must demonstrate a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different").

¶ 71    The defendant next argues in his eighth issue that, even if no error to this point has warranted reversal, his asserted errors had the cumulative effect of denying him a fair trial. See *People v. Speight*, 153 Ill. 2d 365, 376 (1992) ("[W]hile individual trial errors may not require a reversal, those same errors considered together may have the cumulative effect of denying defendant a fair trial."). To this point, we have found no error in five of the defendant's seven issues. In the remaining two issues, we found harmless error in the jury instructions, and we found that we did not need to decide whether the State's comments in closing argument were improper because, even if they were, the comments were harmless or nonprejudicial. If we again assume that the State's comments in closing argument were improper and consider them together with the erroneous jury instructions, we still conclude that the defendant was not deprived of a fair trial because those issues were harmless. See *id.* at 377 (rejecting a claim of cumulative error when the

alleged errors were harmless and the evidence of guilt was overwhelming). The defendant was able to present his defense, and that presentation was not materially hindered by the actual and alleged errors at issue. The dispositive factor was instead the lack of merit of the defendant's claim of self-defense.

¶ 72    In his final issue, the defendant challenges his seventy-year sentences for attempt first-degree murder of a peace officer, asserting that the trial court erred in six different ways in determining his sentence. We find that three of those grounds have merit and that a new sentencing proceeding is required. As a consequence, we do not need to address the remaining grounds.

¶ 73    The defendant did not preserve any of these three arguments below by raising them in his motion to reconsider sentence. See *People v. Hillier*, 237 Ill. 2d 539, 544 (2010) ("It is well settled that, to preserve a claim of sentencing error, both a contemporaneous objection and a written postsentencing motion raising the issue are required." (citing *People v. Bannister,* 232 Ill. 2d 52, 76 (2008))). Therefore, they must be evaluated for plain error. See *id.* at 545.

> "The plain-error doctrine is a narrow and limited exception. [Citation.] To obtain relief under this rule, a defendant must first show that a clear or obvious error occurred. [Citation.] In the sentencing context, a defendant must then show either that (1) the evidence at the sentencing hearing was closely balanced, or (2) the error was so egregious as to deny the defendant a fair sentencing hearing. [Citation.] Under both prongs of the plain-error doctrine, the defendant has the burden of persuasion. [Citations.] If the defendant fails to meet his burden, the procedural default will be honored. [Citation.]" *Id.*

We agree with the defendant that the circuit court's consideration of three improper sentencing factors amounted to first-prong plain error. We will first examine each error individually before addressing their prejudice to the defendant.

¶ 74    The defendant first asserts that in several different comments the court improperly compared Gammonley's traits and life choices to his own. The court began by remarking, "I find it striking that we have two lives [the defendant and Gammonley] both raised here in Chicago that took very different paths." The court continued by praising Gammonley, finding it "noteworthy" that "instead of running away from the scene after backing out of the basement doorway because he [Gammonley] could not have known then the defendant had run out of ammunition having emptied two firearms, [he] ran back into the house and carried the children out of the daycare center so they would not be injured or killed." The court then observed that the defendant, on the other hand, was "screaming and yelling and making demands, 'if anyone comes in the basement I will shoot you, I will kill you.' " The defendant contends that these comments demonstrate that the court improperly considered the traits of a victim in imposing sentence, and he is correct.

¶ 75    The "[p]ersonal traits of victims are not relevant to the question of guilt or innocence or to the question of the proper sentence to be imposed." *People v. Walker*, 109 Ill. 2d 484, 505 (1985) (citing *People v. Bernette*, 30 Ill. 2d 359 (1964)); see also *People v. Joe*, 207 Ill. App. 3d 1079, 1087 (1991) (holding that it was improper to consider the victim's "status," "profession," and "community standing" when imposing sentence). "[P]ersonal traits of a victim may be relevant if necessary to understanding the seriousness of the crime or another sentencing factor, but it is not appropriate if the court considers the personal traits in and of themselves." (Emphasis removed.)

*People v. Cavazos*, 2023 IL App (2d) 220182-U, ¶ 58 (unpublished order under Supreme Court Rule 23).

¶ 76    The court in this case engaged in improper analysis when it highlighted Gammonley's positive traits, including his bravery and his decision to become a police officer. Gammonley's traits were not relevant to the defendant's sentence, and the court did not properly consider them for their relevance to the seriousness of the crime or any other permissible sentencing factor. It was improper for the court to consider Gammonley's traits in the manner that it did.

¶ 77    The defendant next contends that the court considered an improper aggravating factor when it stated, "I would not even want to think about what would have happened had [the police] not investigated the call of a gun, saw a man with a gun, saw the daycare center and left and someone in that daycare center got hurt." The defendant maintains that this comment was unsubstantiated speculation and that there was no evidence that he would have hurt any of the children in the daycare center. We agree.

¶ 78    There was no evidence in this case that the defendant posed a threat to the children in the daycare center prior to the shootout with police. As the officers acknowledged at trial, there were no allegations of anyone in the house being in danger or having been threatened, and the anonymous 911 caller allegedly identified one of the other three people on the porch, and not the defendant, as the person with the gun. The court's speculation that someone in the daycare center might have gotten hurt had the police not searched the home and confronted the defendant was completely unsupported by the record. The court's consideration of this factor was, therefore, a clear error. See *People v. Johnson*, 227 Ill. App. 3d 800, 817 (1992) (holding that resentencing was warranted when a court's findings were not supported by the record).

¶ 79    The defendant also argues that the court erred in stating that the residence where the shooting took place was not his home, that he had no right to defend the residence because it was not his home, and that he should have submitted to the police when they arrived. The specific comments at issue were as follows:

"The defendant made statements that he was protecting his home, that the police were violating his space. The evidence shows that was not his home. He had been staying in that basement about four days because he had been kicked out of his home.

*  *  *

All the defendant had to do when the police approached was stop. That's all he had to do and he didn't and he set into motion the whole chain of events which led us to be here today.

*  *  *

This Court cannot account for that intense anger towards these officers and I would not even want to think about what would have happened if they had not investigated the call of a gun, saw a man with a gun, saw the daycare center and left and someone in that daycare center got hurt. They were doing exactly what we want officers to do and the defendant didn't see that at all. He saw it as an intrusion on a house that wasn't even his, where he'd only been camping out, if you will, for a few days. He had no right to do that. That's something about his character and attitude that really disturbs me."

The court's comments here misstate the building's status as the defendant's home and disregard the defendant's right to retreat into his home and avoid unwanted police contact. Contrary to the court's belief, the evidence showed that 7609 South Lowe Avenue was the defendant's home, and

with the police having no probable cause or even reasonable suspicion to believe that he was engaged in criminal activity, the defendant was under no legal obligation to acquiesce to police demands and cannot be punished for his refusal to do so.

¶ 80    "[T]he right of a man to retreat into his own home and there be free from unreasonable governmental intrusion" is at "the very core" of the fourth amendment. *Silverman v. United States*, 365 U.S. 505, 511 (1961). It does not matter whether you own the home or not, as this protection of the sanctity of one's residence extends even to overnight guests. *Minnesota v. Olson*, 495 U.S. 91, 96–97 (1990) ("[A defendant's] status as an overnight guest is alone enough to show that he had an expectation of privacy in the home that society is prepared to recognize as reasonable."). Further, absent objectively reasonable grounds for police detention, a person "need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way." *Florida v. Royer*, 460 U.S. 491, 498 (1983) (citing *Terry v. Ohio*, 392 U.S. 1, 32–33 (1968) (Harlan, J., concurring)).

¶ 81    Contrary to the circuit court's findings that 7609 South Lowe was not his home, the defendant had been invited to stay there by the home's owner, and he, therefore, had a reasonable expectation of privacy and protection from unwanted government intrusion. When Officers Gammonley and Biszewski arrived at the home, they had no evidence of criminal activity, which they acknowledged in their trial testimony. The defendant, therefore, was well within his rights to refuse any contact with them and to seek refuge in his home. It was clear error for the court to find otherwise and to punish the defendant for exercising that right.

¶ 82    Having found that the circuit court considered three improper factors in sentencing the defendant, we must determine whether there is plain error. The defendant contends that both forms

of plain error are present, that "(1) the evidence at the sentencing hearing was closely balanced" and that "(2) the error was so egregious as to deny the defendant a fair sentencing hearing." *Hillier*, 237 Ill. 2d at 545.

¶ 83    We find that the evidence at sentencing was closely balanced. On one hand, the defendant had a limited criminal history consisting of two drug offenses, and this was his first conviction involving violent conduct. On the other hand, the offenses of which the defendant was convicted were amongst the most serious crimes that one can commit, and "the seriousness of the offense is considered the most important factor in determining a sentence." *People v. Gordon*, 2016 IL App (1st) 134004, ¶ 52. However, given the court's consideration of three improper factors, and particularly its statement that the defendant's decision to exercise his fourth amendment right "really disturbs me," we believe that the court's errors "severely threatened to tip the scales of justice against" the defendant and, therefore, amounted to first-prong plain error. *Herron*, 215 Ill. 2d at 187. Accordingly, we conclude that a new sentencing hearing is warranted.

¶ 84    Having proven his entitlement to resentencing, the defendant argues that the new hearing should be in front of a different judge "in order to remove any suggestion of unfairness." *People v. Heider*, 231 Ill. 2d 1, 25 (2008). However, we decline to find that the court's consideration of the three improper factors at issue creates one of the "rare cases" in which judicial reassignment on remand is necessary. See *People v. Campbell*, 2023 IL App (1st) 220373, ¶ 69. We trust that the circuit court will be able to disregard the factors that it improperly considered and will give the defendant a fair hearing.

¶ 85    For the foregoing reasons, we affirm the defendant's convictions, but we vacate his sentences and remand for a new sentencing hearing.

¶ 86    Affirmed in part, vacated in part, and remanded.

---

*People v. William Jones* **2024 IL App (1st) 221555**

---

Appeal from the Circuit Court of Cook County, No. 17 CR 15971, Honorable Angela M. Petrone, Judge, presiding.

---

Appellants:   JAMES E. CHADD, State Appellate Defender
 DOUGLAS R. HOFF, Deputy Defender
 CHRISTOPHER L. GEHRKE, Supervisor
 Office of the State Appellate Defender
 First Judicial District
 203 N. LaSalle St., 24th Floor
 Chicago, IL  60601
 Phone:  (312) 814-5472

Appellees:   Kimberly Foxx, State's Attorney, County of Cook
 ENRIQUE ABRAHAM, DOUGLAS P. HARVATH, HEATHER
 FAHRENDROK, Assistant State's Attorneys, Of Counsel
 Room 309 Richard J. Daley Center
 Chicago, IL  60602
 Phone:  (312) 603-5496